ORIGINAL

United States District Court
Eastern District of Michigan
Southern Division

United States of America,

        Plaintiff,

        Hon. Jonathan J.C. Grey

v.

        Case No. 23-20451

Tyler N. Ross,

        Defendant.

_____/

## Plea Agreement

The United States of America and the defendant, Tyler N. Ross, have reached a plea agreement under Federal Rule of Criminal Procedure 11. The plea agreement's terms are:

## 1.    Count of Conviction

The defendant will waive his right to an indictment and will plead guilty to Count 1 of the Information. Count 1 charges the defendant with conspiring to commit an offense against the United States under 18 U.S.C. § 371.

## 2.    Statutory Minimum and Maximum Penalties

The defendant understands that the count to which he is pleading guilty carries the following maximum statutory penalties:

Page **1** of **23**

| Count 1 | Term of imprisonment: | Up to 5 years |
| --- | --- | --- |
| | Fine: | Up to $250,000 or twice the gross pecuniary gain or loss |
| | Term of supervised release: | Up to 3 years |

**3.  Agreement Not to Bring Additional Charges**

If the Court accepts this agreement and imposes sentence consistent with its terms, the United States Attorney's Office for the Eastern District of Michigan and the Fraud Section of the United States Department of Justice's Criminal Division will not bring additional charges against the defendant for the conduct reflected in the charging Information, the factual basis of this plea agreement, and the "additional conduct" described in Paragraph 6 of this agreement.

**4.  Elements of Count of Conviction**

The elements of Count 1 (Conspiracy to Commit an Offense Against the United States) are:

(1) Two or more persons conspired, or agreed, to commit the crime of making a false statement to a mortgage lending business for the purpose of influencing the action of that business in connection with a loan, in violation of 18 U.S.C. § 1014;

(2) The defendant knowingly and voluntary joined the conspiracy; and

(3) A member of the conspiracy did one of the overt acts described in the Information for the purpose of advancing or helping the conspiracy.

The elements of the crime of making a false statement to a mortgage lending business for the purpose of influencing the action of that business in connection with a loan, in violation of 18 U.S.C. § 1014, are:

(1) An individual made a false statement to a mortgage lending business;

(2) That individual made the false statement to the mortgage lending business knowing it was false; and

(3) That individual did so for the purpose of influencing in any way the action of the mortgage lending business in connection with the loan.

5.    **Factual Basis**

The parties agree that the following facts are true, accurately describe the defendant's role in the offense, and provide a sufficient factual basis for the defendant's guilty plea:

From at least in or around 2015, through at least in or around 2019, in the Eastern District of Michigan and elsewhere, TYLER ROSS conspired and agreed with others to violate Title 18, United States Code, Section 1014, by knowingly making a false statement to a mortgage lending business for the purpose of influencing the action of that business in connection with a loan.

ROSS knowingly and voluntarily joined this conspiracy.

Specifically, ROSS, at relevant times, served as a manager and Co-Chief Executive Officer ("CEO") at ROCO Real Estate LLC and ROCO Management LLC (collectively "ROCO"), which were limited liability corporations with their principal places of business in Bloomfield Hills, Michigan, and were incorporated in or around June 2011 and November 2015, respectively. ROCO operated as a commercial real estate investment firm engaged in the business of purchasing, managing, and selling multi-family residential properties, such as

apartment complexes, located in the Eastern District of Michigan and elsewhere (collectively the "ROCO Properties"), for itself and its private investors who invested in specific ROCO Properties. ROSS was also an investor in ROCO Properties. ROSS exercised ultimate control over the operations of ROCO and was involved in the company's daily operations.

Starting no later than 2015 and continuing through at least in or around 2019, ROSS and his co-conspirators agreed to, and did, submit, and cause to be submitted, false financial documents to mortgage lending businesses for underperforming ROCO Properties, making the properties appear to be more profitable than they were.

ROSS and his co-conspirators did so to:

(1) Make it appear in financial documents submitted as part of ongoing reporting requirements for existing mortgages that underperforming ROCO Properties were performing better and were continuing to meet required Debt Service Coverage Ratios ("DSCR"), which were a ratio of a property's Net Operating Income ("NOI") to its total debt service obligations; and

(2) With respect to refinancing applications, to obtain favorable mortgage valuations in accordance with lenders' underwriting requirements and influence the actions of those lenders in connection with the refinancing applications.

Mortgage lending businesses relied on ROCO's financial reporting for the NOI and DSCR performance of its properties to determine the value of the property for refinancing into a revolving loan credit facility and to assess ROCO's continuing ability to meet its obligations during the loan period. If a ROCO property failed to meet or maintain a certain DSCR ratio after closing, certain mortgage lending businesses could exercise contractual provisions to protect themselves, including, but not limited to, requiring ROCO to maintain rental payments in escrow for oversight and safekeeping or restricting future loan opportunities for ROCO.

The false financial documents that the conspirators agreed to submit, did submit, and caused to be submitted to mortgage lending businesses during the conspiracy were historical operating statements for ROCO Properties. These statements, which were often provided in twelve-month reports referred to as trailing twelve-months operating statements ("T12"), tracked the financial performance, including various categories of income and expenses, of a property over the preceding twelve months and aggregated the property's performance and profitability in the NOI calculation.

During, and in furtherance of, the conspiracy, ROSS and his co-conspirators caused false information to be included in the T12s submitted to mortgage lending businesses for underperforming ROCO Properties. To falsely overstate the NOI for these underperforming properties, ROSS and his co-conspirators, among other things: (a) extracted the true and accurate T12s from ROCO's internal accounting system; (b) deleted or reduced actual expenses incurred from the T12s, such as cable television costs, sewer costs, contractor costs (cleaning, painting and drywall, *etc.*), various employee wages, travel, office supplies, management fees, computer costs, marketing, and trash collection; and (c) inflated income for certain itemized funding streams, such as late charges, bad debt rent write-offs, and miscellaneous income, and by omitting rent concessions and adjustments.

ROSS personally falsified T12s during the course of the conspiracy and directed other members of the conspiracy to assist with the creation and submission of falsified T12s.

Among the specific overt acts in furtherance of the conspiracy detailed above were the following:

(1) On or about March 13, 2017, ROSS emailed false financial statements to a mortgage lending business for the purpose of influencing the action of that business in connection with the issuance of mortgage loans to ROCO. Those documents, which ROSS knew to be false, overstated the NOI for several ROCO properties, including Atwood Oaks, The Lakes at Ridgeway, and University Courtyard. The mortgage provider of these loans was a financial institution as that term was defined in Title 18, United States Code, Section 20.

(2) On or about August 20, 2017, a co-conspirator of ROSS, an executive at ROCO, emailed ROSS with financial performance information for certain ROCO Properties and provided T12 financial statements that "could be submitted as is."

(3) On or about August 20, 2017, that same co-conspirator emailed ROSS again with financial performance information for other ROCO Properties, which were underperforming, and noted that data "need[ed] to be reviewed prior to submitting." Among the underperforming properties were Atwood Oaks and University Courtyard. ROSS's co-conspirator included T12 financial operating statements for the underperforming properties and indicated to ROSS that "[w]ithin each of the Operating Statements is now a TAB called 'adjustments' specifically for reviewing/adjusting. . . ." In the email to ROSS, ROSS's co-conspirator noted that another tab on the operating statements reflected the DSCR for the relevant property and that the figure would "update each time you enter something within the Adjustments TAB." ROSS's co-conspirator asked ROSS to "[p]lease send me back the review/updated copies and I will get these prepared for submission along with the others."

(4) On or about August 21, 2017, ROSS emailed that same co-conspirator revised and falsified T12s for several underperforming ROCO Properties, including Atwood Oaks and University Courtyard.

(5) On or about August 21, 2017, that same co-conspirator emailed false T12 financial statements to a mortgage lending business for the purpose of influencing the action of that business in connection with mortgage loans that had been issued to ROCO. Those T12 documents falsely overstated the NOI for several ROCO Properties and included the false T12s for Atwood Oaks and University Courtyard that had been sent to the co-conspirator by ROSS.

(6) On or about May 17, 2018, at ROSS's direction, ROSS's co-conspirator emailed a false T12 financial statement to another mortgage lending business for the purpose of influencing the action of that business in connection with a mortgage loan that had been issued to ROCO. That T12 document falsely overstated the NOI for Barrington Park, a ROCO Property. The mortgage provider of this loan was a financial institution as that term was defined in Title 18, United States Code, Section 20.

(7) On or about February 22, 2019, at ROSS's direction, ROSS's co-conspirator emailed false T12 financial statement to a mortgage lending business for the purpose of influencing the action of that business in connection with a mortgage loan that had been issued to ROCO. Those T12 documents falsely overstated the NOI for several ROCO Properties, including Atwood Oaks, The Lakes at Ridgeway, and University Courtyard. The mortgage provider of this loan was a financial institution as that term was defined in Title 18, United States Code, Section 20.

6.    **Additional Conduct**

The parties disagree as to whether certain additional conduct relating to the provision of false T12s in connection with the sale of ROCO property in 2019 (the "2019 Sale") constitutes relevant conduct for purposes of U.S.S.G. § 1B1.3 and determination of the applicable guideline range and sentence in this matter. Both parties reserve the right to present the Court with additional information regarding the 2019 Sale to aid in the Court's determination of whether the conduct constitutes relevant conduct for purposes of U.S.S.G. § 1B1.3 and determination of the applicable guideline range and sentence in this matter.

7.    **Advice of Rights**

The defendant has read the Information, has discussed the charges and possible defenses with his attorney, and understands the crime charged. The defendant understands that, by pleading guilty, he is waiving many important rights, including the following:

A.    The right to plead not guilty and to persist in that plea;

B.    The right to a speedy and public trial by jury;

C.    The right to be represented by counsel—and, if necessary, have the court appoint counsel—at trial;

D.    The right to be presumed innocent and to require the government to prove the defendant guilty beyond a reasonable doubt at trial;

E.    The right to confront and cross-examine adverse witnesses at trial;

F.    The right to testify or not to testify at trial, whichever the defendant chooses;

G.    If the defendant chooses not to testify at trial, the right to have the jury informed that it may not treat that choice as evidence of guilt;

H.    The right to present evidence or not to present evidence at trial, whichever the defendant chooses; and

I.    The right to compel the attendance of witnesses at trial.

**8.    Collateral Consequences of Conviction**

The defendant understands that his conviction here may carry additional consequences under federal or state law. The defendant understands that, if he is not a United States citizen, his conviction

here may require him to be removed from the United States, denied

citizenship, and denied admission to the United States in the future.

The defendant further understands that the additional consequences of

his conviction here may include, but are not limited to, adverse effects

on the defendant's immigration status, naturalized citizenship, right to

vote, right to carry a firearm, right to serve on a jury, and ability to hold

certain licenses or to be employed in certain fields. The defendant

understands that no one, including the defendant's attorney or the

Court, can predict to a certainty what the additional consequences of

the defendant's conviction might be. The defendant nevertheless affirms

that the defendant chooses to plead guilty regardless of any

immigration or other consequences from his conviction.

9.    **Defendant's Guideline Range**

   A.    **Court's Determination**

The Court will determine the defendant's guideline range at

sentencing.

   B.    **Acceptance of Responsibility**

The government recommends under Federal Rule of Criminal

Procedure 11(c)(1)(B) that the defendant receive a two-level reduction

for acceptance of responsibility under U.S.S.G. § 3E1.1(a). Further, if the defendant's offense level is 16 or greater and the defendant is awarded the two-level reduction under U.S.S.G. § 3E1.1(a), the government recommends that the defendant receive an additional one-level reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(b). If, however, the government learns that the defendant has engaged in any conduct inconsistent with acceptance of responsibility—including, but not limited to, making any false statement to, or withholding information from, his probation officer; obstructing justice in any way; denying his guilt on the offense to which he is pleading guilty; committing additional crimes after pleading guilty; or otherwise demonstrating a lack of acceptance of responsibility as defined in U.S.S.G. § 3E1.1—the government will be released from its obligations under this paragraph, will be free to argue that the defendant not receive *any* reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, and will be free to argue that the defendant receive an enhancement for obstruction of justice under U.S.S.G. § 3C1.1.

C.    **Other Guideline Recommendations**

For purposes of this plea agreement, the parties also recommend under Federal Rule of Criminal Procedure 11(c)(1)(B) that the following guideline provisions apply:

| Guideline Section | Description |
|---|---|
| *2B1.1(a)(2)* | *Base Offense Level of 6* |
| *2B1.1(b)* | *No Loss* |
| *3B1.1(c)* | *Organizer/Leader (2 levels)* |

The parties have no other agreed-upon recommendations as to the defendant's guideline calculation.

D.    **Parties' Obligations**

Both the defendant and the government agree not to take any position or make any statement that is inconsistent with any of the guideline recommendations or factual stipulations in paragraphs 9.B, or 9.C of this agreement.

The parties disagree as to whether the additional conduct identified in paragraph 6 constitutes relevant conduct for purposes of U.S.S.G. § 1B1.3 and the corresponding determination of the applicable

guideline range and sentence in this matter. The parties also disagree as to whether the enhancement under U.S.S.G. §2B1.1(b)(17)(A) and U.S.S.G. §2B1.1(b)(17)(D) apply in determining the applicable guideline range. The government believes that the additional conduct constitutes relevant conduct and that the identified enhancements apply in determining the applicable guideline range while the defendant does not.

The parties agree that except for the specifically identified guideline disputes in this paragraph, and the agreed-upon recommendations in paragraphs 9.B. and 9.C., neither party may make any other guideline recommendation affecting the determination of the applicable guideline range.

### E.   Not a Basis to Withdraw

The defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if he disagrees, in any way, with the guideline range determined by the Court, even if that guideline range does not incorporate the parties' recommendations or factual stipulations in paragraphs 9.B or 9.C or his recommendations as to the disputed issues in paragraph 9.D. The government likewise has

no right to withdraw from this agreement if it disagrees with the guideline range determined by the Court.

## 10. Imposition of Sentence

### A. Court's Obligation

The defendant understands that in determining his sentence, the Court must calculate the applicable guideline range at sentencing and must consider that range, any possible departures under the sentencing guidelines, and the sentencing factors listed in 18 U.S.C. § 3553(a), and apply any applicable mandatory minimums.

### B. Imprisonment

#### 1. Recommendation

If the Court finds that the enhancements under U.S.S.G. §2B1.1(b)(17)(A) and U.S.S.G. §2B1.1(b)(17)(D) apply in determining the applicable guideline range, the government will recommend, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(B), that the defendant's sentence of imprisonment vary below the low end of the defendant's guideline range as determined by the Court. The government otherwise retains full discretion as to its recommendation regarding the specific sentence of imprisonment in this matter.

### 2. No Right to Withdraw

The defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if the Court decides not to follow any sentencing recommendation made by either party. The government likewise has no right to withdraw from this agreement if the Court decides not to follow the recommendation of either party. If however, the Court rejects or purports to reject any other term or terms of this plea agreement, the government will be permitted to withdraw from the agreement.

### C.    Supervised Release

### 1.    Recommendation

There is no recommendation or agreement as to a term of supervised release.

### 2.    No Right to Withdraw

Any recommendation regarding the imposition of a term of supervised release made by either party is not binding on the Court. The defendant understands that he will have no right to withdraw from this agreement or withdraw his guilty plea if the Court decides not to follow the recommendation of either party.

**D.     Fines**

There is no recommendation or agreement as to a fine.

**G.     Special Assessment**

The defendant understands that he will be required to pay a special assessment of $100 due immediately upon sentencing.

**11.   Appeal Waiver**

The defendant waives any right he may have to appeal his conviction on any grounds.

Both the government and defendant preserve their rights to appeal the Court's determination whether the additional conduct identified in paragraph 6 constitutes relevant conduct. In the event the Court determines that the additional conduct constitutes relevant conduct, either party may appeal the Court's determination whether the enhancements under U.S.S.G. §2B1.1(b)(17)(A) and U.S.S.G. §2B1.1(b)(17)(D) apply in determining the applicable guideline range. Both the government and defendant agree that neither party may appeal the sentence on any other ground.

12.   **Collateral Review Waiver**

The defendant retains the right to raise claims alleging ineffective assistance of counsel or prosecutorial misconduct, as long as the defendant properly raises those claims by collateral review under 28 U.S.C. § 2255. The defendant also retains the right to pursue any relief permitted under 18 U.S.C. § 3582(c), as long as the defendant properly files a motion under that section. The defendant, however, waives any other right he may have to challenge his conviction or sentence by collateral review, including, but not limited to, any right he may have to challenge his conviction or sentence on any grounds under 28 U.S.C. § 2255 (except for properly raised ineffective assistance of counsel or prosecutorial misconduct claims, as described above), 28 U.S.C. § 2241, or Federal Rule of Civil Procedure 59 or 60.

13.   **Consequences of Withdrawal of Guilty Plea or Vacation of Judgment**

If the defendant is allowed to withdraw his guilty plea, or if the defendant's conviction or sentence under this agreement is vacated, the government may file additional charges against the defendant relating, directly or indirectly, to any of the conduct underlying the defendant's guilty plea or any relevant conduct. If the government files any

additional charges as permitted by this paragraph, the defendant

waives his right to challenge those charges on the ground that they

were not filed in a timely manner, including any claim that they were

filed after the limitations period expired.

**14.    Use of Withdrawn Guilty Plea**

The defendant agrees that if he is permitted to withdraw his

guilty plea for any reason, he waives all of his rights under Federal

Rule of Evidence 410, and the government may use his guilty plea, any

statement that the defendant made at his guilty plea hearing, and the

factual basis set forth in this agreement, against the defendant in any

proceeding.

**15.    Parties to Plea Agreement**

This agreement does not bind any government agency except the

United States Attorney's Office for the Eastern District of Michigan and

the United States Department of Justice Criminal Division's Fraud

Section.

**16.    Scope of Plea Agreement**

This plea agreement is the complete agreement between the

parties and supersedes any other promises, representations,

understandings, or agreements between the parties concerning the subject matter of this agreement that were made at any time before the guilty plea is entered in court. Thus, no oral or written promises made by the government to the defendant or to the attorney for the defendant at any time before the defendant pleads guilty are binding except to the extent they have been explicitly incorporated into this plea agreement. If the parties have entered, or subsequently enter, into a written proffer or cooperation agreement, though, this plea agreement does not supersede or abrogate the terms of that agreement. This plea agreement also does not prevent any civil or administrative actions against the defendant, or any forfeiture claim against any property, by the United States or any other party.

## 17.   Acceptance of Agreement by Defendant

This plea offer expires unless it has been received, fully signed, by the United States Attorney's Office and the United States Department of Justice Criminal Division's Fraud Section by 10:00 pm EDT on July 21, 2023. The government may withdraw from this agreement at any

time before the defendant pleads guilty.

Dawn N. Ison
United States Attorney

Glenn Leon
Chief, Fraud Section,
Criminal Division
United States Department of
Justice


John K. Neal
Chief, White Collar Crime Unit
Assistant United States
Attorney

Avi M. Perry
Chief, Market Integrity and
Major Frauds Unit


Andrew J. Yahkind
Assistant United States Attorney

Andrew R. Tyler
Trial Attorney


Philip B. Trout
Trial Attorney

By signing below, the defendant and his attorney agree that the defendant has read or been read this entire document, has discussed it with his attorney, and has had a full and complete opportunity to confer with his attorney. The defendant further agrees that he understands this entire document, agrees to its terms, has had all of his questions answered by his attorney, and is satisfied with his attorney's advice and representation.

Mark J. Kriger
Attorney for Defendant

Dated: 7/12/23

Tyler N. Ross
Defendant

Page 23 of 23