UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,                       CRIMINAL NO. 23-cr-20451

v.                                    HON. JONATHAN J.C. GREY

TYLER N. ROSS,

               Defendant.

_____/

### Government's Sentencing Guidelines Brief

Tyler Ross is awaiting sentencing after admitting that he led a multi-year conspiracy to systematically falsify financial statements reflecting the financial performance of his company. The draft PSR has correctly calculated Ross's applicable sentencing guideline range to be 46-57 months' imprisonment.

The financial statements that Ross and his subordinates falsified were commonly referred to as "T12s": trailing twelve month operating statements for multi-family residential properties.[1] Ross has admitted that he is guilty of the charged offense because he conspired with other employees at his company to falsify

---

[1] Sometimes this financial information was provided over a shorter time frame— "T6" for trailing six months operating statements, "T3" for trailing three months operating statements, etc.

T12s provided to his company's lenders in both quarterly and annual reporting, as well as in connection with debt refinancing applications between 2015 and 2019. During the same period that he engaged in the crime of conviction, Ross also engaged in his systematic pattern of falsification by causing false T12s to be provided in connection with a June 2019 property sale by his company for more than $500 million ("2019 Sale"). That sale, which is the focus of this briefing, was financed by a New York-based financial institution ("Financial Institution"). As part of the 2019 Sale, Ross falsified T12s for many of the same properties for which he had previously falsified other T12s that were provided to his company's lenders. In other words, Ross first caused a false second set of books to be generated that were provided to his company's lenders and then caused another false set of books to be generated for some of those same properties in order to sell them.  By virtue of his falsifications, Ross personally received over $2 million in proceeds from the 2019 Sale.

Ross's fraudulent conduct in connection with 2019 Sale constitutes relevant conduct to his crime of conviction for purposes of Section 1B1.3 of the U.S. Sentencing Guidelines ("Guidelines"). Ross's receipt of over $2 million from that conduct qualifies for an enhancement under Section 2B1.1(b)(17)(D) of the U.S. Sentencing Guidelines, which applies when the "defendant derive[s] more than

$1,000,000 in gross receipts from one or more financial institutions as a result of the offense." Ross disagrees with this position but his arguments are not well founded.

For the reasons stated in this memorandum, the guidelines calculation for Ross should result in a **total offense level of 23** (offense level of 26 minus 3 levels for acceptance of responsibility), which carries a guideline range of 46-57 months' imprisonment (incorporating a Criminal History Category I). This is the same guideline calculation determined by the Probation Department in the draft PSR disclosed on December 19, 2023.

If the Court finds that the enhancement under Section 2B1.1(b)(17)(D) applies, the parties have agreed that a variance is appropriate in this case. The government therefore reserves making a final sentencing recommendation until after the January 22, 2024, evidentiary hearing and the Court's subsequent Guidelines determination.

## I.     Facts and Procedural History

On September 28, 2023, Ross pleaded guilty to a one count information charging him with conspiracy to commit an offense against the United States under 18 U.S.C. § 371, contrary to 18 U.S.C. § 1014, namely that Ross and ROCO made false T12 statements to a mortgage lending business knowing that the statements were false for the purpose of influencing the mortgage lending business in

connection with a loan. Ross's plea was entered pursuant to a Rule 11 plea agreement. (Doc. 12).

### A. General Background

ROCO Real Estate LLC began operating in or around 2012 (and was later joined by ROCO Management LLC, collectively "ROCO") as a company owned by Ross and three other individuals. ROCO's business was purchasing, managing, and selling hundreds of millions of dollars' worth of apartment complexes on behalf of itself and its investors from its principal place of business in Bloomfield Hills, Michigan. Ross served as ROCO's Co-Chief Executive Officer.

From at least 2015 through at least 2019, Ross conspired with other ROCO employees to falsify ROCO's financial records that were submitted to ROCO's lenders. These falsifications occurred in primarily two ways: (1) by providing false financial information in quarterly and annual T12 reports submitted to lenders on underperforming properties and (2) by providing false T12 financial information to lenders in connection with debt refinancing applications for underperforming properties.

Prior to each apartment complex acquisition, ROCO solicited investors to contribute to the financing for the deals and in return provided high rates of return

to the investors.[2] To obtain funding to purchase multi-family properties, ROCO acquired financing for the property deals through a variety of private lenders. Many of these deals were funded by two government-sponsored enterprises ("GSE-1" and "GSE-2"; collectively, the "GSEs"), and through private lenders acting as seller-servicers of the loans, either initially, or as refinances.

Lenders evaluated the viability of a particular potential loan both before agreeing to fund it and after funding it in order to monitor its ongoing performance. To do so, lenders relied on certain financial information provided by the borrower, including, in particular, the T12 operating statements. T12s tracked the financials (expenses against income) of the property over the preceding twelve months and aggregated the property's performance in the Net Operating Income ("NOI"). The NOI essentially showed the profitability of the property (which also corresponds to the property's value). The NOI from these T12 reports was also used to calculate the debt service coverage ratio ("DSCR"), which was a ratio of a property's income (NOI) to its total debt obligations and was an indicator of whether a property can sustain its debt based on its income. Lenders relied on the DSCR to determine whether to issue a loan, the terms of the loan, and to assess a borrower's continuing ability to meet its obligations during the loan period, among other things. On certain

---

[2]     ROCO also typically contributed to each deal itself and because ROSS owned 40% of ROCO, every investor distribution also personally benefitted ROSS.

loans, if a property failed to meet or maintain a certain DSCR ratio after closing ("DSCR Rate"), the lender would be able to exercise certain contractual provisions to protect itself, including requiring rental payments be kept in an escrow-like account (often referred to as a "lockbox") for oversight and safekeeping and/or the lender could also restrict future loan opportunities.[3]

### B. Ross's Conduct

ROCO expanded aggressively in 2014 and 2015 by acquiring a number of underperforming properties. There were at least three ways in which ROCO submitted T12 financials to third parties in connection with its properties: (1) in quarterly and annual reports to the lenders for existing loans; (2) in connection with refinancing agreements reached with lenders; and (3) in connection with any potential sale. Ross substantially and systematically falsely inflated the performance of their underperforming properties for all three types of financial submissions.

First, Ross caused ROCO to submit falsified T12s for underperforming properties to lenders for reporting purposes. ROCO was required under its loan agreements to provide to lenders updated financial information on properties on a regular basis. After acquiring certain properties that were not performing sufficiently

---

[3] The use of a lockbox was particularly problematic for ROCO because of the way ROCO regularly and systematically internally loaned money from performing properties to underperforming properties to pay invoices (notwithstanding different investor groups across different properties). The installation of lockboxes would have interrupted this practice.

well to meet the DSCR Rate for that loan, Ross deliberately and systematically falsified the T12s to make it appear that the properties had higher NOIs than they did in order to boost the property's DSCR, as he admitted in his plea agreement. (Doc. 12 at 5).  By way of example, on August 20, 2017, a ROCO employee sent Ross an email attaching spreadsheets specifically for underperforming properties that did not have a DSCR above 1.2 to allow Ross to manipulate and inflate the DSCR above 1.2. (*See* Exhibit 1).  As Ross admitted in his plea agreement, he falsified these T12s by (1) dishonestly reducing expenses, such as cable television costs, sewer costs, contractor costs (cleaning, painting and drywall, *etc.*), various employee wages, travel, office supplies, management fees, computer costs, marketing, and trash collection, and (2) dishonestly inflating income, such as late charges, bad debt rent write-offs, and miscellaneous income, and by omitting rent concessions and adjustments. (Doc. 12 at 7; *see also*, *e.g.*, Exhibit 2). Ross personally falsified T12s and also directed other ROCO employees to assist with the creation and submission of false T12s. (Doc. 12. at 7).

Second, Ross admitted that he caused ROCO to submit false financials in connection with refinancing agreements for underperforming properties. (Doc. 12 at 5). In these instances, Ross and ROCO employees executed the falsifications in the same way as described above—by fabricating income and expense financial data in the T12s to boost the DSCR. But instead of providing them as part of an ongoing

reporting requirement, ROCO submitted them to get more favorable rates and terms on refinanced loans. Most of the refinancing agreements occurred during the relevant time period using a large credit facility ROCO opened with GSE-1. To be eligible for the terms available through this credit facility, the properties in the credit facility needed to collectively meet the requisite DSCR Rate. When refinancing a number of underperforming properties, ROCO falsified the T12s to improve the DSCR Rate, which kept the credit facility DSCR above its required DSCR Rate.

Third, ROSS caused ROCO to submit false financials in connection with the 2019 Sale of 43 properties to a privately held real estate investment company based in New York ("Buyer") for over $500 million, from which ROSS received over $2 million in proceeds. The Financial Institution financed approximately $480 million of the Buyer's purchase and promptly securitized that debt.[4] ROSS directly received over $2 million in proceeds from the 2019 Sale. (*See* Exhibit 3; *see also* Draft PSR ¶ 13).[5] Ross knew that the Financial Institution was financing the sale prior to the deal being executed. The Buyer submitted over three years' worth of financial information provided by ROCO to the Financial Institution so that the bank could evaluate and underwrite the deal. The T12s provided to the Financial Institution for

---

[4]     Some of Ross's falsified T12 information was passed on by the Financial Institution to potential investors as part of its sale of the associated securities.

[5]     This exhibit consists of an excerpt of a larger tracing analysis that specifically shows the July 2, 2019 wire sent to Ross totaling over $2 million.

the underperforming ROCO properties were falsified by Ross, with assistance from a co-conspirator, in the same manner that Ross and others had systematically falsified this information as described above—by reducing the expenses and increasing the income to significantly inflate the NOI (and corresponding DSCR). Notably, Ross and his co-conspirators typically inflated the NOI in the same manner but significantly more in the financials provided to the Financial Institution for the 2019 Sale than they had in those provided to the lenders for the exact same properties. For example:

| Property | Year | Approximate Internal ROCO NOI | GSE | Approximate NOI Provided to Seller-Servicers/GSEs | Approximate NOI Provided to Financial Institution |
|---|---|---|---|---|---|
| Atwood Oaks (Pensacola, Florida) | 2016<br>2017<br>2018 | $78,000<br>$90,000<br>$336,000 | GSE-1 | $441,000<br>$441,000<br>$529,000 | $433,000<br>$462,000<br>$590,000 |
| Barrington Park (Mobile, Alabama) | 2016<br>2017<br>2018 | $27,000<br>$162,000<br>$286,000 | GSE-2 | $377,000<br>$330,000<br>$412,000 | $246,000<br>$363,000<br>$402,000 |
| The Lakes at Ridgeway (Memphis, Tennessee) | 2016<br>2017<br>2018 | $782,000<br>$1,036,000<br>$1,075,000 | GSE-1 | $942,000<br>$1,070,000<br>$1,194,000 | $1,444,000<br>$1,374,000<br>$1,463,000 |
| University Courtyard (Tallahassee, Florida) | 2016<br>2017<br>2018 | -$256,000<br>$59,000<br>$296,000 | GSE-1 | $385,000<br>$481,000<br>$497,000 | $760,000<br>$787,000<br>$644,000 |

For 2018 (the full calendar year immediately prior to the 2019 Sale), ROCO's internal accounting system aggregated the total NOI for the 43 properties sold in the 2019 Sale as approximately $30 million. For the same time period for the very same properties, Ross caused ROCO to submit to the Buyer, which were later submitted to the Financial Institution, falsified T12s showing an NOI of approximately $40 million. (*See* Exhibit 4). The 2018 financials submitted to the Buyer for one property (University Courtyard) provides an example of the level of detail and sheer amount of line-by-line falsification that Ross executed. (*See* Exhibit 2 and Exhibit 5).[6] This snapshot gives an idea of the scale of Ross's falsification for each month of each underperforming property, including in different amounts for the GSEs as compared to those provided for the 2019 Sale, both of which differed substantially from ROCO's internal financials.

Representatives of the lenders and the Financial Institution indicated that the NOI and DSCR were important financial information that they used to evaluate the viability of the loan and that had they known the true performance of these properties they would have: (1) likely exercised their contractual protections for pre-existing

---

[6]     Note that Exhibit 2 shows the T12 comparison totals for all of 2018, whereas Exhibit 5 shows only a comparison for January 2018. The pink highlighting indicates the amount that certain figures were different from the underlying accurate ROCO data obtained from ROCO's internal accounting system (separately for both what was submitted to the GSEs and what was submitted for the 2019 Sale). The NOI totals are found at the bottom of the exhibits in the line described "5999-9999" and for Exhibit 2 the total NOI corresponds directly to the last line in the chart above for University Courtyard in 2018.

loans, including use of the "lockbox;" (2) would not have entered into the refinancing agreements at the same negotiated terms; and/or (3) would not have agreed to finance the 2019 Sale at the agreed terms and rates. In addition, the Buyer and his team relied on the T12s in evaluating the viability and valuation of the 2019 Sale.

### C. Plea Agreement

As part of his Rule 11 plea agreement, Ross admitted, in part, that he falsified T12s sent to lenders by reducing expenses and inflating income to (1) make it appear underperforming properties were meeting the DSCR Rates in connection with ongoing reporting requirements and (2) to obtain favorable mortgage valuations in connection with refinancing agreements. (Doc. 12 at 5-7). Ross specifically admitted falsifying and causing the submission of false T12s for certain properties in 2017, 2018, and 2019. (Doc. 12 at 8-9).

In the Rule 11 plea agreement, the parties agreed to disagree on whether Ross's conduct in connection with the 2019 Sale constitutes relevant conduct for Ross's count of conviction under U.S.S.G. § 1B1.3 and the applicability of U.S.S.G. § 2B1.1(b)(17)(A) to that conduct. (Doc. 12 at 10). Accordingly, the government expects the defense to propose that the total offense level applicable to Ross's conduct was 6, based on the following calculation:

- Base Offense Level (§ 2B1.1(a)(1)): <u>6</u>
- Aggravating Role – Organizer/Leader (§ 3B1.1(c)): <u>+2</u>

- Acceptance of Responsibility: -2
- Total Offense Level: 6

The government proposes a total offense level of 23, based on the following calculation:

- Base Offense Level (§ 2B1.1(a)(1)): 6
- Receipt of more than $1 million (§ 2B1.1(b)(17)(A & D): increase to 24
- Aggravating Role – Organizer/Leader (§ 3B1.1(c)): +2
- Acceptance of Responsibility: -3
- Total Offense Level: 23

The only disputed sentencing issues are (1) whether the 2019 Sale constitutes relevant conduct for Ross's offense of conviction under U.S.S.G. § 1B1.3; and (2) whether Ross's receipt of more than $1 million in proceeds from the 2019 Sale makes the U.S.S.G. § 2B1.1(b)(17)(A) enhancement applicable to Ross's Guidelines calculation. As part of the agreement, Ross waived his right to appeal his conviction, both Ross and the government reserved their right to appeal the sentencing determination of the disputed issues related to the 2019 Sale described above, and both Ross and the government agreed not to appeal the sentence on any other ground. (Doc. 12 at 18).

## II.    Guidelines Calculation

The PSR appropriately determined that the contested sentencing enhancement applied to Ross's conduct and calculated a total offense level of 23. Draft PSR (¶¶

33-41). For the reasons discussed below, the Court should adopt the Draft PSR's calculations.

### A. The Draft PSR Correctly Determined that the 2019 Sale was Relevant Conduct

The Draft PSR correctly found that the 2019 Sale was relevant conduct to Ross's 18 U.S.C. § 371 conviction. Draft PSR (¶ 33). Under Guidelines § 1B1.3(a)(2), for certain offenses, including Ross's offense of conviction in this case, relevant conduct includes all acts and omissions by the defendant that were part of the "same course of conduct or common scheme or plan" as the offense of conviction.[7] "Relevant conduct is not limited to conduct for which the defendant has been convicted." *United States v. Maken,* 510 F.3d 654, 658 (6th Cir.2007) (citation omitted). However, it must be criminal in nature. *United States v. Henry*, 819 F.3d 856, 865 (6th Cir. 2016).

The Sixth Circuit has explained how to assess relevant conduct as follows:

> To qualify as part of a "common scheme or plan" under the "relevant conduct" guideline, the offenses "must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" If offenses do not qualify as part of a common scheme or plan, offenses are nonetheless considered the "same course of conduct" if "they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses." The three factors relevant to determining whether offenses are sufficiently related to constitute the "same course of conduct" include "the degree of similarity of the offenses, the

---

[7]     The substantive 18 U.S.C. § 1014 offense underlying Ross's conspiracy conviction is a property offense listed in the Guidelines Appendix A as calculated under § 2B1.1.

regularity (repetitions) of the offenses, and the time interval between the offenses." The commentary requires courts to balance these factors such that "when one of [these] factors is absent, a stronger presence of at least one of the other factors is required."

*United States v. Koeberlein,* 161 F.3d 946, 950 (6th Cir. 1998). These principles have been applied by courts in many similar, if not identical circumstances to find conduct not included in the offense of conviction to be relevant conduct. *See, e.g., United States v. Skouteris*, 51 F.4th 658, 672 (6th Cir. 2022) ("all of the conduct that is the subject of the loss calculation not only occurred during the time contemplated in the indictment, but it also involved nearly identical deeds to the offenses of conviction—namely, unauthorized settlement and forgery of settlement checks"); *United States v. Vysniauskas*, 593 F. App'x 518, 530 (6th Cir. 2015) ("Although the primary victims were different, both schemes shared the same underlying characteristic: passing bad checks under a false name, with intent to cash out as much of the value as possible."); *United States v. Woods*, 367 F. App'x 607, 611–12 (6th Cir. 2010) (conduct relevant where the half-sister accomplice was the same, there was a common *modus operandi* of stealing mail to obtain credit card and other identifying information from the elderly, and a common purpose of obtaining goods and money); *United States v. McDaniel,* 398 F.3d 540, 553 (6th Cir. 2005) (finding relevant conduct where "the *modus operandi* (stealing mail, washing checks in acetone, and altering the checks' payees and amounts), the victims (financial institutions in the Grand Rapids, Michigan area), and the time period (fall 2001)

14

involved in [defendant's] state and federal prosecutions were the same."); *see also United States v. Bryson*, 94 F. App'x 389, 399 (7th Cir. 2004) (affirming district court finding that additional loans were relevant conduct because they were "within a similar time frame, involved a common scheme, involved a similar *modus operandi*, and involved common accomplices" in a mortgage fraud scheme using inflated appraisals to obtain loans from multiple different banks for different properties). The application of these principles to this case shows that Ross's fraudulent conduct in connection with the 2019 Sale was relevant conduct to his offense of conviction.

Ross has acknowledged personally falsifying financial statements for ROCO from at least 2015 through at least 2019. He admits that he did so for the purposes of providing ongoing reporting to mortgage lenders and obtaining mortgage refinancing (*i.e.*, a new mortgage with new funding from the lender). He has also acknowledged conspiring with others to generate falsified financial statements for these purposes. He admits he engaged in this conduct to make it appear that underperforming ROCO properties were more profitable than they were. In pleading guilty, Ross does not dispute the obvious: this conduct was criminal. But he simultaneously takes the remarkable position that falsifying the same T12 financial statements, in the same manner to inflate the NOI, for the same properties, during the same period does not amount to relevant criminal conduct when those statements

are used to in a lender-financed sale of over $500 million in ROCO properties.[8] Put

differently, Ross used the same *modus operandi,* the same accomplices, and the

common purposes of obtaining funds from lenders, all during the same time period.

*See United States v. Koeberlein,* 161 F.3d 946, 950 (6th Cir.1998); *cf. United States*

*v. Hill*, 79 F.3d 1477, 1481–82 (6th Cir. 1996) (collecting and discussing cases where

conduct occurring before the charged offenses was found not to be relevant conduct).

For the reasons discussed below, Ross is wrong. Generating false financial

statements to sell half a billion dollars in property, providing those false statements

to a potential buyer, and then actually selling those properties after that buyer has

obtained approximately $480 million in bank financing using those false statements

is conduct that is both plainly criminal and plainly relevant to Ross's offense of

conviction.

Ross's fraudulent conduct in connection with the 2019 Sale of ROCO

properties violated at least three federal statutes (along with corresponding

conspiracy liability): 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C. § 1344(2) (Bank

Fraud), and 18 U.S.C. § 1014 (False Statement). Each of these crimes is discussed

below and, as demonstrated by the materials submitted by to the Probation

Department, has been established by a preponderance of the evidence.

   1.   18 U.S.C. § 1343 (Wire Fraud)

---

[8]    Ross made two substantial written submissions to the U.S. Probation Office prior to the issuance of the Draft PSR clearly laying out Ross's position on these issues.

Ross committed wire fraud against the Buyer when he utilized falsified T12s to sell him over $500 million in real estate. These T12s for 2016, 2017, 2018, and part of 2019 were falsified in the same way that they were falsified when Ross submitted them to ROCO's own lenders for reporting and refinancing: by fraudulently reducing expenses and fraudulently inflating income, all to make the properties appear more profitable than they were.

Although Ross maintains that the Buyer was not defrauded because he had sufficient information to fairly evaluate the properties, the Buyer's statements and documents show that the Buyer and his team relied on the falsified T12s during their due diligence process prior to the 2019 Sale to make decisions about the sale. The Buyer hired two private companies to assist the Buyer in the due diligence and valuation of the 2019 Sale properties. Both of those firms expressly stated that they relied on the falsified T12s that Ross generated. Specifically, they explained how they relied on the T12s for their baseline financial information and then spent extensive effort layering on their own assumptions, modeling, and future projections based on their expertise and the Buyer's business model. The firms used the T12s to create a baseline, place cash flows in spaces, and do forward projections to forecast what it costs to operate the properties properly. By analyzing the T12s, these firms were able to evaluate the income generating potential and value of the properties

during the due diligence phase and provide their analysis to the Buyer prior to the final closing.

Contemporaneous records generated by these firms acting on behalf of the Buyer show their reliance on Ross's falsified T12s. For example, spreadsheets created by the firms show Ross's falsified T12s being incorporated by the firms for the analysis and valuation of the 2019 Sale properties during the due diligence process prior to the sale.

During the due diligence process, the firms the Buyer used were able to uncover some of the inaccuracies in the false T12s provided and the Buyer used that information to negotiate a lower purchase price. However, the Buyer's team did not uncover most of the NOI manipulation in the due diligence process. And these firms, unsurprisingly, indicated that it would be very important for them to know if Ross's ROCO-provided NOI was overstated by 30-40% from those T12s originally provided to the Buyer.

The fact that the Buyer's team did not uncover all of Ross's fraud is really evidence of Ross's fraudulent intent. The evidence demonstrates that Ross intentionally did not falsify verifiable expenses like taxes and insurance and instead focused on manipulating financial inputs that were difficult or impossible to check or substantiate, like bad debt, all to conceal the fraud. Moreover, the failure of the Buyer and his team to realize the extent to which they were being duped is irrelevant

to the question of whether a crime was committed. Courts have consistently held that it is no defense to a fraud charge that a victim failed to discover they were being defrauded. *See, e.g.*, *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."). Similarly, the fact that the Buyer was provided other financial documents that were not falsified is no defense to Ross's systematic and intentional falsification of the T12s provided for the 2019 Sale. *See id.* The Buyer relied on the T12s as accurate summaries of the properties' historical performance to value and evaluate the 2019 Sale during the due diligence phase prior to closing.

Once the 2019 Sale was complete, the Buyer's property manager described the ROCO properties as being "in the red from day one" and having "lost millions" before the end of the first year of the Buyer's ownership. (*See* Exhibit 6). The Buyer's loan from the Financial Institution ultimately went into default at the end of last year and the Buyer has been working to sell the 2019 Sale properties in hopes of fully satisfying the outstanding balance of the loan.[9] The Buyer now attributes the difficulties with the 2019 Sale properties to misrepresentations made to him by ROCO prior to the sale. *Id.*

---

[9]    If the 2019 Sale had not closed, Ross would have faced all of these same problems covered up by the falsified T12s.

The government has agreed not to argue that Ross should be held accountable for causing any loss. But loss is not an element of wire fraud, bank fraud, or false statements. 18 U.S.C. §§ 1014, 1343, 1344(2). Therefore, whether or not Ross caused a loss in connection with the 2019 Sale does not change the fact that Ross committed the relevant conduct, which was plainly criminal.

2.  18 U.S.C. § 1344(2) (Bank Fraud)

Ross also committed bank fraud against the Financial Institution when he caused the Financial Institution to provide approximately $480 million in financing for the 2019 Sale based on his falsified T12s.  At the time of the closing (and before), Ross knew that the Buyer would obtain financing in the normal course of pursuing the sale and that the lender would require the seller-provided T12s. Ross knew that because it is normal industry practice to provide the seller's T12s to the lender, and in fact was what ROCO had to do in connection with its own financing for its properties, including in the refinancings that are incorporated in Ross's conviction in this case. (*See* Doc. 12 at 5).  Ross further admitted in his September 2020 recorded interview with federal agents that (1) he knew that the Buyer got financing for the sale; (2) that he knew the Financial Institution was the Buyer's lender for the 2019 Sale; and (3) that (based on his own experience buying properties) he thought that ROCO's T12s would be provided to the Financial Institution in connection with the 2019 Sale.

Ross contends that he did not know the Buyer would obtain financing from the Financial Institution at the time Ross made his fraudulent T12s misstatements and therefore he did not commit bank fraud. But Ross's focus is misplaced: he clearly knew that the Financial Institution was financing the 2019 Sale at the time the sale closed and has admitted that he expected his falsified T12s to have been provided to the Financial Institution by that time (as they were). And it is at that point, when the Financial Institution loan money was authorized to be disbursed at closing for a fraudulent sale that netted him millions, that Ross's bank fraud was executed.

Ross also claims that the Financial Institution should have figured out his fraud because he separately gave the Financial Institution financial information related to properties later included in the 2019 Sale. Again, whether a victim should have figured out a fraud being perpetrated on them is irrelevant. *See Coyle*, 63 F.3d at 1244. But Ross leaves out some key facts. The additional financial information provided by ROCO was to a completely different department at the Financial Institution in connection with a separate loan application having nothing to do with the 2019 Sale. And it was provided more than a year prior to the 2019 Sale closing. This proceeding is about the criminal conduct Ross did engage in from 2015 to 2019 and is not about giving credit for other instances in life that Ross did not break the law, including in connection with this entirely separate loan application.

Furthermore, the spreadsheet of additional financial information ROCO provided to the Financial Institution did not actually contain comprehensive historical T12 information that could be matched up to Ross's false T12s provided for the 2019 Sale. The information instead provided NOI calculations based on "budget" and T3 information for most of the properties. In sum, the information that Ross describes as accurate was provided to the Financial Institution through an entirely separate process a year before the 2019 Sale and did not include comprehensive T12 information.

For this type of bank fraud, all that is needed is that (1) the defendant defrauded a non-financial institution entity; (2) the resulting loan was funded by bank property from a qualifying financial institution; and (3) defendant was aware that the loan was funded by the bank. 18 U.S.C. § 1344(2); *United States v. Nicoletti*, 849 Fed. App'x 574, 579 (6th Cir. 2021). Simply put, Ross (1) defrauded a non-financial institution entity (the Buyer); (2) the resulting loan was funded by the Financial Institution (a qualifying financial institution); and (3) Ross knew that the loan was funded by the Financial Institution.

### 3. 18 U.S.C. § 1014 (False Statement)

Ross also committed a crime when he caused the Buyer to make false statements to the Financial Institution for the purpose of influencing the Financial Institution, namely the submission of the falsified T12s. The evidence that Ross

knew that he was causing the Buyer to submit false T12 financials to the Financial Institution is the same evidence described above: (1) Ross admitted in his recorded statement to law enforcement that he understood ROCO's T12s would be submitted to the Financial Institution based on his own experience as a buyer submitting seller-provided T12s to lenders for property purchase financing; (2) Ross admitted as part of his plea agreement that he submitted false T12s to the GSEs for ROCO's own refinancings to obtain favorable lender underwriting valuations (which is what he was causing the Buyer to do in connection with the Buyer's loan from the Financial Institution to close the deal at a favorable price to ROCO); (3) contemporaneous emails that show Ross's awareness of the Financial Institution's role as the Buyer's lender prior to closing; and (4) Ross's substantial industry experience.

### B. The Draft PSR Correctly Applied an Enhancement Under § 2B1.1(b)(17)(A) Because Ross Received more than $1,000,000 from a Financial Institution in Proceeds from the 2019 Sale

Under the Guidelines, an enhancement applies if the "defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense." U.S.S.G. § 2B1.1(b)(17)(a). The Financial Institution's reliance on Ross's falsified T12s was straightforward in all three statutory scenarios described above: (1) Ross caused ROCO to provide the falsified T12s to the Buyer; (2) the Buyer used the T12s in the loan application process for the loan to get financing from the Financial Institution (as Ross knew the Buyer would); and (3) the Buyer

23

used the proceeds of the Financial Institution loan to buy the properties from ROCO at closing, from which Ross personally received over $2 million.

As an initial matter, the June 19, 2019 settlement statement executed by both the Buyer and ROCO to complete the 2019 Sale clearly reflected that the Financial Institution financed the Buyer's purchase by providing $481 million. (Exhibit 8); *See Nicoletti*, 849 Fed. App'x at 580 (finding that the identification of the lender on settlement statements was sufficient to prove the defendant's knowledge of the lender). And a tracing analysis of the proceeds of that transaction shows that of the $132 million disbursed directly to ROCO, approximately over $2 million ended up in Ross's personal accounts on July 2, 2019. (Exhibit 3).

Ross contends that the Financial Institution could not have relied on his false T12s in making its $481 million loan to the Buyer, rendering the sentencing enhancement inapplicable. But the Financial Institution clearly did rely on Ross's falsified T12s. The Financial Institution used, and relied on, Ross's false T12s during its loan process, in particular the falsified T12 NOIs. The T12 information and the NOIs in particular were important to the Financial Institution and was relied on by the Financial Institution to (1) rate the cash flow of the properties through the DSCR, which in turn was used as one metric to calculate the value of the properties and the size of the loan (material artificial inflation of this calculation could lead to the wrong pricing of the properties, which could expose the Financial Institution to risk

of loss); (2) rate the cash flow of the properties (derived from the false NOI) for purposes of determining the loan's interest rate; (3) provide to the appraisers, who in turn used the T12 information in part to arrive at their independent valuations of the properties; and (4) prepare historical operating information that was presented to potential investors who subsequently purchased the Financial Institution's securities of the debt from the Buyer's loan. (Exhibit 7 and Exhibit 9).[10]

Had the Financial Institution known ROCO's T12 NOIs were falsified prior to the loan closing, it would have halted the deal, reassessed, and possibly walked away from the loan altogether. In short, the Financial Institution relied on the false T12s to value the properties, size the loan, determine the interest rate, and sell the associated securities. One Financial Institution employee explained that a significantly different NOI would result in a very different loan—both a different sized loan based on valuation and one with a different interest rate based on higher risk. Therefore, the loan the Buyer obtained based on Ross's falsified T12s would not have been available from the Financial Institution if the true NOI had been

---

[10]     For example, the University Courtyard property appraisal report prepared for the Financial Institution directly incorporates much of the false T12 information Ross provided to the Buyer and also includes Ross's falsified T12s in an addendum to the report. (Exhibit 7 at 76 and Addendum C). For the prospective investor term sheet, the NOI figure incorporates the falsified T12 information Ross provided to the Buyer, while also including other normalization assumptions by the Financial Institution.  (Exhibit 9 at 72). The approximately $1.48 million 2018 NOI listed in the investor term sheet for the Lakes of Ridgeway property closely tracks the approximately $1.46 million NOI in the falsified T12s, as compared to the true internal ROCO NOI, which was approximately $1.08 million.

provided. If anything, any possible loan based on the true NOI would have been smaller with a higher interest rate and the likelihood that either the Buyer or the Financial Institution would have proceeded at all under those circumstances appears slim.

It is true, as Ross claims, that his T12s provided for the 2019 Sale were unreliable, but that is only because he systematically falsified them. The true T12s were reliable. And just because a party does not warrant the accuracy of information does not mean it can falsify information and use it to defraud. Ross's falsified T12s were not, as he claims, immaterial documents with a tenuous connection to the 2019 Sale that was not foreseeable to Ross. Instead, Ross's personally and systematically falsified T12s contained important information that both the Buyer and the Financial Institution used and relied on for the sale and loan issuance, from which Ross personally received over $2 million.

In short, the draft PSR correctly increased the offense level to 24 pursuant to § 2B1.1(b)(17)(D) because Ross received more than $1,000,000 in gross receipts from the Financial Institution and the resulting offense level would only be 8. Draft PSR (¶ 33). The Court should adopt these findings because they are consistent with the law and facts of the case.

### III.   Conclusion

For the reasons described above, the Court should find that the Draft PSR correctly calculates Ross's offense level by applying the enhancement pursuant to § 2B1.1(b)(17)(D).

Respectfully submitted,
DAWN N. ISON
United States Attorney

s/Andrew J. Yahkind
ANDREW J. YAHKIND
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226

Glenn Leon, Chief
Fraud Section, Criminal Division

s/Andrew R. Tyler
ANDREW R. TYLER
PHILIP B. TROUT
Trial Attorneys
1400 New York Ave., NW
Washington, D.C. 20005

Dated: December 22, 2023

## Certificate of Service

I hereby certify that on December 22, 2023, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Mark Kriger and Deday LaRen
Attorneys for Tyler Ross

I also certify that I will, on today's date, email a copy of the foregoing document to Xia Vue, the assigned probation officer in this matter.

s/Andrew R. Tyler
Andrew R. Tyler
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud
Section
