UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,

v.                                 Case No. 23-20451
                                 Hon. Jonathan J. C. Grey

TYLER ROSS,

               Defendant.

_____/

**RESPONSE TO GOVERNMENT'S SENTENCING GUIDELINES BRIEF**

The broad brushstrokes with which the government introduces its arguments in the opening pages of its brief, in which, for example, it claims to be discussing a "systematic pattern of falsification," R. E. 19, Brief, Page ID # 112, obscure the significant reality that is fatal to its cause: that Mr. Ross neither committed nor participated in any criminal activity directed against the Financial Institution in connection with ROCO's 2019 sale of properties to the Buyer, and for that reason alone, the enhancement at issue cannot be applied to him.

In a similar vein, but with a difference in emphasis, the government spends the best part of the next ten pages of its submission exploring, in great detail, the conduct to which Mr. Ross pled guilty (and is not therefore in dispute),[1] albeit with varying

_____

[1] The charge to which Mr. Ross pled guilty is predicated upon the submission by the real estate company of which he was a member (ROCO) of false Net Operating

degrees of accuracy,[2] in the apparent hope that its adversarial momentum will simply carry it along, all the while ignoring the indisputable fact that the 2019 property sale was fundamentally different from those activities, even though they both involved the submission of inaccurate T12s.

Since this re-hashing of information unrelated to the sale cannot form the basis for the enhancement, one can only assume that the government's goal is to try to use

---

Income (NOI) statements to a lender which had financed its purchase of apartment complexes. Under the terms of the loan, ROCO was required to submit quarterly reports of the NOI to the lender. The NOI statements that ROCO provided for some of the properties stated that these properties were performing better than their actual NOI. This was done in order for ROCO to meet Debt Service Coverage Ratios ("DSCR"), which is the ratio of a property's Net Operating Income ("NOI") to its total debt service obligations. If the DSCR falls below a certain level, the lender can require the rent revenues to be placed in a "lockbox," which would allow the lender to take the loan payments before any of the rent revenue is distributed to ROCO.

Although the actual DSCR for some of the properties fell below the DSCR, ROCO made each and every payment in a timely manner. It should also be noted that the loans were secured by the properties financed and Mr. Ross also signed a personal guarantee. Because each and every payment was made in a timely manner, the parties have stipulated in the Rule 11 plea agreement that there is no loss or intended loss related to the count of conviction.

[2] Thus, for example, at footnote 3, it argues that "[t]he use of a lockbox was particularly problematic for ROCO because of the way ROCO regularly and systematically internally loaned money from performing properties to underperforming properties." R. E. 19, Brief, Page ID # 116. This latter assertion is simply incorrect, because the threatened "lockbox" requirements would, for obvious reasons, apply only to the underperforming properties, and would have no impact on the performing properties (which by definition would have met the DSCR requirements) or the availability of funds from those properties.

Mr. Ross's acknowledged wrongdoings in an attempt to color the Court's judgement on this separate matter.  This is especially true considering that the government's presentation ignores the fact that Mr. Ross's plea involved no loss, no intended loss, and no intent to defraud[3].  Moreover, ROCO's own lenders apparently did not consider the false statements to be material.  ROCO changed its reporting practices in 2020, and began supplying accurate quarterly reports; the first report and payment was accompanied by a letter acknowledging that false statements had been submitted in the past. Yet despite the fact that ROCO acknowledged that it had submitted inaccurate quarterly reports in the past and that some of the properties were not currently meeting the debt service ratio, the lenders never imposed a "lockbox" requirement, even on the most notably underperforming properties.

While Mr. Ross stands by the terms of his agreement to plead guilty in this case, he strongly disputes the government's dire conclusions regarding the impact of the inaccurate information which he supplied.  For example, some of the changes to the information provided to the lenders were in fact solicited by the lenders themselves ——as a normal part of the financing process.

---

[3] 18 USC § 1014 does not require an intent to defraud, only that the false statement be made with the intent to influence the financial institution's actions. In the case at bar, ROCO not only never missed a payment but every payment was on time and the government does not contest that ROCO always intended to make its loan payment.  As more fully explained below, the false statements' only purpose were to avoid the lockbox.

The government's discussion of the 2019 sale also omits certain critical facts. Chief among them, as is discussed later, is that both the buyer of the properties in the 2019 sale and the Financial Institution which financed that sale were aware of the inaccuracies in the T12s and did their own calculation of the value of the properties involved.

The government argues that Mr. Ross's actions in providing inaccurate T12 to the Buyer constituted either wire fraud against the Buyer or the Financial Institution, in violation of 18 U.S.C. § 1343, bank fraud, in violation of 18 U.S.C. §1344(2) or a false statement to the Financial Institution, in violation of 18 U.S.C. §1014.  These claims must fail, however, for several reasons: (1) because there was no fraud as to the Buyer; and (2) because Mr. Ross committed no crime against the Financial Institution.

To put these contentions into perspective, some explanation of the 2019 sale, and the role the T12s played in it, is in order.  ROCO is a company that is in the business of buying and selling apartment complexes.  Mr. Ross was an employee and part owner of ROCO at the time of the sale.  In 2018, ROCO utilized the services of a Detroit-based Real Estate brokerage company to market the sale of a portion of ROCO's portfolio.  The brokerage firm forwarded the marketing material to the

Buyer, and after months of negotiations, in June 2019, ROCO sold 43 properties to the Buyer, a real estate investment company in New York.

The ROCO marketing material included T12s which contained inaccuracies - inaccuracies which made some properties in the portfolio appear to be performing better than they were, similar to the documents submitted in connection with its loan service obligations which formed the basis for the plea. Although T12s are nominally historical documents, the use of projected (or aspirational) data in the purchase and sale of this kind of real estate is not uncommon, and ROCO has repeatedly encountered it in transactions in which it was the buyer, rather than the seller. These modified documents are intended to show the properties' potential, and to pique the potential buyer's interest - to "get them to the table," so to speak.

This is important to note because unquestionably, "only conduct that is criminal in nature qualifies as relevant conduct under § 1B1.3," *United States v. Henry,* 819 F.3d 856, 865 (6th Cir. 2016), and, simply put, Mr. Ross did not commit any offenses against either the Buyer or the Financial Institution in connection with the 2019 sale.

**Mr. Ross did not commit fraud against the Buyer**

If Mr. Ross had misled the Buyer into believing that the T12s were historically accurate, then it could reasonably be argued that Mr. Ross committed fraud against it. However, that is not what happened in this case. At the very same time that ROCO

sent the Buyer the inaccurate T12s, ROCO also sent all the raw data from its own

internal accounting system which accurately reflected the income and expenses and

allowed the buyer or its agents conducting the due diligence on behalf of the buyer to

determine the true operating income and expenses.[4]   After providing the Buyer with

---

[4]  A large volume of information was provided to the Buyer, of which the T12s were
only a small part.  These materials included the following:

    1 Aged Receivable Reports
    2 Aging Summary Reports
    3 Rent Rolls
    4 Balance Sheets
    5 Title and Survey
    6 Financial Responses January 7, 2019
    7 2016 - 2018 T12s
    8 2016 - February 2019 T12s (non-assumptions)
    9 Freddie Mac Permanent Loan Documents
    10 Insurance Documents
    11 Lease Agreements
    12 Marchmont & Colfax Condo Documents
    13 Friedman Due Diligence Requests
    14 Ohio Formation Documents
    15 Tax Bills
    16 Service Contracts by Property
    17 Tenant Ledgers
    18 Zoning Letters
    19 Diligence Requests
    20 Occupancy Reports
    21 Property Employee List
    22 Utility Providers

Although there are some differences in figures shown by T12's and data from ROCO's
internal accounting system, the overall materials submitted for due diligence review
painted an accurate picture. This is demonstrated by the report of Frederick Chin, a
forty-year real estate industry veteran, attached as Exhibit One, this complete set of

this information, Mr. Ross and the Buyer met in February of 2019, four months prior to the closing, and discussed the fact that the T12s were not accurate and that Buyer was basing his analysis on the raw data.

The government concedes that the due diligence process undertaken by the Buyer did in fact "uncover some of the inaccuracies in the false T12s provided and the Buyer used that information to negotiate a lower purchase price," but claims that "most" of the inaccuracies were not discovered. *Id.*, at Page ID # 128.  This is simply not accurate, but even if it was, it would still defy reason to believe that the Buyer (or its due diligence agents) would continue rely on a document that it knew to be inaccurate.

Moreover, if the T12s were as significant to the Buyer's decision-making process as it apparently now claims, the obvious question becomes why did it not ask for the T12s to be included in the extensive list of documents which were required to be warranted as accurate in the purchase agreement?  And it is also to be noted that in Exhibit Two, an "issues list" which the Buyer brought to the February 2019 meeting at which he "negotiate[d] a lower purchase price," based on a review of the raw data, it listed its priorities in order and placed that "issue" as number six out of seven on the list.

---

information allowed both the Buyer and the Financial Institution "to fairly evaluate the properties." (Chin Report at 2).

But despite all this evidence, which is contained in the government's own discovery materials, the government continues to suggest that the Buyer was misled by the inaccurate T12s, even though the evidence it chooses to rely on to make this assertion does not support the claim.[5]  For example, the government points to an email by the Buyer's property manager, Government Exhibit 6, about the properties being "in the red from day one," but in the very same paragraph, the property manager spells out the reasons why the properties are struggling, neither of which had anything to do with the T12s.  He says that there was higher vacancy than on the rent rolls, but the rent rolls provided were accurate (taken directly from ROCO's own accounting software), and complains that expenses were higher due to all the "down units".  But, information on down units was not even contained in T12s.

The government also claims that the Buyer has been working to sell the properties "in hopes of fully satisfying the outstanding balance of the loan."  R. E.19,

---

[5]  The term "the Buyer" in the text is used interchangeably to refer to the firm which acquired the properties and its principal owner, who is an extremely experienced real estate professional. See Wikipedia Article attached as Exhibit Three. His firm has bought and sold some of the premier real estate buildings in the United States.  In addition to its not inconsiderable internal resources, the firm hired three other firms to help complete due diligence on the ROCO portfolio acquisition.  These firms are known as some of the most respected, experienced, and knowledgeable real estate companies in the country.  They were paid considerable funds from the Buyer (some $5.8 million to one alone) to make sure the proper due diligence was completed.

Brief Page ID # 129.[6]  The Buyer has, indeed, sold off some of the properties, but it has been anything but a fire sale.  In fact, defendant's research has disclosed that to date, the Buyer has now sold 15 of the 43 properties he bought for a total of $68,175,436 more than he paid.   And rather than feeling as if he was burned by the 2019 sale experience, the Buyer let it be known that he had gotten a good deal (*see,* Exhibit Five, text messages between a ROCO principal and a New York broker), and, in 2022 (three years after the sale and after having had more than enough time to evaluate his purchase), reached out to ROCO in an attempt to purchase additional properties.[7]  This resulted in both a phone call and a lengthy meeting, during which the buyer never once suggested that there had been any wrongdoing concerning the purchase of the portfolio in 2019.  It seems beyond unlikely that a person who believed he had been defrauded or even misled when he purchased a portfolio of

---

[6]  The government also claims that "the loan went into default last year," *ibid.*, but the assertion is contradicted by the public record, which shows the loan as "always performing" See, Exhibit Four.  The "default" referred to by the government is a "maturity default" stemming from a disagreement over whether or not the Buyer had a right to extend his loan, and played no role in the financial institution's decision to finance the purchase. Upon information and belief, the Buyer has never missed a single payment.

[7]  Attached as Exhibit Six is a transcript of a January 14, 2022 telephone call between a member of ROCO and a representative of a real estate brokerage and management firm, in which the broker representative states that he met with the Buyer, who said he wanted to purchase the remainder of the ROCO portfolio. Thereafter, a meeting between Mr. Ross and the Buyer did take place, but no sale resulted.  A transcript of the meeting is attached as Exhibit Eight.

apartments for hundreds of millions of dollars would reach out to again purchase properties from the very same seller.

Despite what is now being claimed, the evidence inescapably points to the conclusion that the buyer knew that the T12s were not historically accurate and based its purchase price not on the T12s, but on the underlying accurate data that was supplied to him along with them. And, as is discussed more fully below, it must also be pointed out that at the original February 2019 meeting the Buyer never mentioned his intention to finance the purchase, and it was only several months after this meeting that ROCO learned that the Buyer would be doing so.

**Mr. Ross did not commit a crime against the Financial Institution.**

This should be obvious for two overarching reasons, which will be discussed in detail: 1. Mr. Ross had no motive to defraud the Financial Institution; and 2. Mr. Ross was not aware that any financial institution would be involved in the Buyer's purchase of the portfolio at the time ROCO provided the T12s to the Buyer.

It would not have been in Mr. Ross's interest to execute a scheme to obtain the Financial Institution's money because Mr. Ross would have been better off without its involvement. Under the penalty provisions in the purchase agreement, if the Buyer, for some reason, was unable to close the transaction, then ROCO would have kept its properties, and the Buyer would have owed ROCO nearly $37 million, which is

significantly more than ROCO made from the sale.  It goes without saying that ROCO certainly would not have engaged in a scheme to defraud that paid less than what ROCO would have received if no fraud had been committed.

Also, when ROCO gave the Buyer the T12s, it cannot have been to obtain the Financial Institution's money, because the Financial Institution was not then involved in the transaction. As the Second Circuit noted in *United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 662 (2d Cir. 2016), "the common law's contemporaneous fraudulent intent principle [is] incorporated into the federal mail and wire fraud statutes."  And, of course, "[t]he bank fraud statute was modeled on the mail and wire fraud statutes.  *Neder v. United States,* 527 U.S. 1, 20-21 (1999).

When Mr. Ross made the inaccurate statements in the T12s, he had no goal of obtaining the Financial Institution's money as the bank fraud statute requires. *Loughrin v. United States*, 573 U.S. 351, 355-57 (2014).  In addition, Mr. Ross had no role in the Buyer's decision to engage a Financial Institution, a decision which was "wholly fortuitous" *Loughrin*, 573 U.S. at 365 and only learned of that decision months later.

Although it is standard practice in the industry for a purchaser to forward the T12s to a potential lender, Mr. Ross certainly would not have anticipated that the Buyer would forward T12s to the financial institution that he knew to be inaccurate

without mentioning this fact.  Rather, he would have assumed that the Buyer would have notified the financial institution that the T12s were inaccurate (which, in fact, it did) and would ask ROCO to furnish accurate T12s if requested.

In *Loughrin*, the Supreme Court explained that a false statement can "naturally induc[e]" a bank to part with its property in two ways. First, and most clearly, a false statement "naturally induc[es]" a bank when a defendant makes the false statement to the bank itself, such as by trying to cash a forged or altered check at the teller's window. *Id.* At 363. Second, a false statement can also "naturally induc[e]" a bank when a defendant offers a forged or altered check to a third-party store such as Target that "accepts a check *only to* pass it along to a bank for payment." *Id.* At 363-64 (emphasis added).

The T12s do not fall into either category. Mr. Ross did not provide the T12s to the Financial Institution, and Mr. Ross did not provide the T12s to a third party who accepted them *only to* pass them along to a bank for payment. *See id*. The Buyer accepted the T12s as part of its negotiations with ROCO in a transaction in which the Financial Institution was not a party.  And ROCO provided the T12s to the Buyer not simply so that the Buyer could pass them to the Financial Institution (who was not in the picture), but so that the Buyer could use the T12s for his own purposes as part of his own due diligence.

For similar reasons, Mr. Ross did not make a false statement to the Financial Institution as part of the sale, within the reach of 18 U.S.C. § 1014. In fact, Mr. Ross made no statements to the Financial Institution, so any criminal liability would rest on aiding and abetting or conspiracy theories, and neither applies - nor does the government seem to claim.[8] Furthermore, simply making a false statement to a financial institution is not in itself a violation of 18 USC § 1014 unless that false statement was made for the purposes of influencing the actions of that financial institution.  As discussed above, ROCO/Mr. Ross would have realized a far larger profit had the Buyer not been able to secure financing and for that reason did not close

---

[8]  To succeed under an aiding and abetting theory, the government must prove that the defendant: (1) did something to help or encourage the crime; (2) with the intent that the crime be committed. *See United States v. Chavez*, 951 F.3d 349, 362 (6th Cir. 2020); Sixth Circuit Pattern Criminal Jury Instructions, 4.01 (2021). Neither requirement is met here.

Mr. Ross did not take an "affirmative act" to help the Buyer make a false statement to the Financial Institution. *See Rosemond v. United States*, 572 U.S. 65, 71 (2014). Mr. Ross did nothing specifically to help the Buyer submit the T12s to the Financial Institution. *See United States v. Brown*, 151 F.3d 476, (6th Cir. 1998) (reversing false statements conviction because defendant did not assist "the *filing* of documents" with HUD) (emphasis in original).

For the same reasons, Mr. Ross also did not conspire with the Buyer. A conspiracy would require that Mr. Ross and the Buyer had "a mutual understanding" "to cooperate with each other to commit" a crime, Sixth Circuit Pattern Criminal Jury Instructions, 3.02, of which there is (and the government has suggested) no evidence whatsoever.

on the deal. Thus, he unquestionably had no motive to mislead, defraud, or influence the Financial Institution in any way.

Also, ROCO had already provided *accurate* information about the property values to the Financial Institution. Before the 2019 sale took place, ROCO sent the Financial Institution one of its own internal valuations of the properties in connection with an application for a business loan. This valuation showed that ROCO believed the properties were worth more than what the Buyer eventually paid (and more than what the Financial Institution eventually lent). Additionally, this spreadsheet contained all the accurate NOIs for the properties that were sold.

The Government contends this is meaningless because the information was sent to a different department at the Financial Institution. R. E. 19, Brief, Pg. ID # 131. But even if it is indeed true that the Financial Institution does not internally share information across departments, it is something Mr. Ross had no way of knowing and certainly speaks to his lack of intent. Finally, two weeks before closing, at the Buyer's request, ROCO furnished the Buyer with accurate bank statements for a sampling of properties which the Buyer in turn gave to the Financial Institution that also contained a full picture of the NOIs of the properties.

**Mr. Ross did not obtain more than $1 million from The Financial Institution "as a result of" false statements in the T12s.**

Even if Mr. Ross were responsible for criminal conduct involving the Financial Institution — which, as discussed above, he is not—the $1 million enhancement does not apply on its own terms.

To meet its burden, the government must not only prove that the 2019 Sale is relevant conduct, but must also prove that Mr. Ross individually derived more than $1 million from the Financial Institution "as a result of the offense." U.S.S.G. §2B1.1(b)(17)(A). This "simple language" requires the government to show that the Financial Institution "extended credit *because of* [the defendant's] false statements." *United States v. Sandlin*, 589 F.3d 749, 757 (5th Cir. 2009) (emphasis added); *United States v. Johnson*, 732 Fed. App'x 638, 664 (10th Cir. 2018); *see also United States v. Muho*, 978 F.3d 1212, 1226 (11th Cir. 2020) (applying enhancement when defendant "tricked the bank with forged documents, inducing the bank to initiate the wire transfer"); *United States v. Khedr*, 343 F.3d 96, 101 (2d Cir. 2003) (applying enhancement where defendant obtained bank receipts "*because* he submitted fraudulent loan applications) (emphasis added).

The government spends much of its brief arguing that the Financial Institution relied on the inaccurate T12s in their decision-making processes.  R. E. 19, Brief, Page

15

ID # 127-128, 135-136.  The Guideline's language requires a showing that The Financial Institution actually "relied on" the false statements in the T12s. *United States v. Johnson, supra*, at 664. And it requires the government to prove "a cause and effect relation between" the false statements "and the bank's decision to authorize the loan." *United States v. Sandlin, supra*, at 757 (finding application of the enhancement to be plain error); *accord United States v. Johnson, supra*, at 664 (reversing application of enhancement). But the Government cannot satisfy this burden for the simple and incontrovertible reason that the evidence leaves no doubt that the Financial Institution **knew** that the information in the T12s was not accurate.

This is shown, for example, by Exhibit Nine, emails between an employee of the Financial Institution and an employee of a financial advisory firm assisting in the due diligence process, who advises the Financial Institution employee that "during our due diligence period, we identified $3.5MM of other income that we do not believe was actually being collected. . .." and had to "right-size operating expenses by ~ $375/unit."  Similarly, the Financial Institution acknowledged that the expenses were not accurate.  See, for example,  Exhibit Ten, an exchange which took place less than two months before closing, in which a Financial Institution employee involved in processing the loan writes to another Financial Institution employee also involved in processing the loan states, "I don't get why the expenses are a secret and the other

employee replies, "bc they are made up." The Financial Institution cannot, in light of this, now honestly claim that it was unaware of the fact that the T12s were inaccurate.

What's more, even if the T12s were "necessary" for the loan approval as a box checking exercise (for example, if the Financial Institution's policies required T12s before a loan would be approved), the enhancement requires that the bank must make the loan "because of [the defendant's] false statements." *United States v. Sandlin, supra*, at 757; *accord, United States v. Johnson, supra*, at 664. It simply strains credulity to believe that a lender, much less a lender of the stature and experience of the Financial Institution that ultimately financed the purchase, could or would make a half billion dollar loan "because of" documents it knew to be inaccurate. This is particularly true considering the extensive underwriting that was conducted by the Financial Institution.

The lender conducted its own extensive due diligence, which undoubtedly formed the actual basis of its decision. This included independent appraisals, multiple site visits, and a review of the same underlying documents that ROCO had sent to the Buyer. All the available information leads to the conclusion that the Buyer and the Financial Institution correctly assessed that the properties were worth at least as much as what the Buyer paid and what the Financial Institution lent, and this value was the basis for the Buyer's purchase and for the Financial Institution's loan.

These conclusions are confirmed by longstanding legal principles of causation. Under those principles, a person is generally responsible only for those harms for which he was both a but-for and a proximate cause. *United States v. Pritchard*, 964 F.3d 513, 516 (6th Cir. 2020); *United States v. Rothwell*, 387 F.3d 579, 583 (6th Cir. 2004). The language of §2B1.1(b)(17)(A) reflects these principles, triggering an enhancement only if a defendant derived more than $1 million from a financial institution "as a result of the offense." As the Supreme Court has recognized, "[t]he words 'as a result of' plainly suggest causation," *Paroline v. United States*, 572 U.S. 434, 445 (2014), as do similar uses of the statutory term "result." *See Burrage v. United States*, 571 U.S. 204, 210-216 (2014); *Pac. Op. Offshore, LLP v. Valladolid*, 566 U.S. 207, 221 (2012); *Brown v. Gardner*, 513 U.S. 115, 119 (1994); *United States v. Rothwell, supra*, at 583.

Additionally, the sentencing enhancement is particularly inappropriate on these facts. The enhancement is meant to apply when a bank is "a target" and "a victim" of the offense. *United States v. Muho, supra*, at 1224-26. As noted above, it simply cannot be argued that the Financial Institution was Mr. Ross's target considering that no Financial Institution was involved in the transaction until months after the T12s were supplied to the Buyer, the purchase was not contingent on financing, and the

18

Buyer did not notify ROCO it would be seeking to finance the purchase until well after the purchase price was negotiated.

Also, the "primary purpose" of the enhancement is to "penalize an individual for placing a financial institution at risk by borrowing or stealing funds to support criminal activity." *United States v. Huggins*, 844 F.3d 118, 123-24 (2d Cir. 2016); *see also United States v. Muho, supra*, at 1225 n.8. It would be bizarre to apply the enhancement to Mr. Ross, who did not supply the inaccurate T12s to the Financial Institution, and who, when asked to supply additional information to the Financial Institution, furnished only accurate data.  The loan to the Buyer was also highly favorable to the Financial Institution and supported by rigorous underwriting.

It should therefore be of no surprise that the enhancement doesn't fit (as applied to a seller who was not the borrower of the loan used to finance the sale at issue). This is because undersigned counsel's research has failed to disclose a **single** reported case where the enhancement was applied under a similar factual scenario, nor has the government cited such a case.

On these facts, the enhancement would also be Draconian. By singlehandedly increasing the offense level to 24, the enhancement is the primary driver behind an advisory sentencing guidelines range of roughly four to five years in prison for events that, under the government's own plea agreement, involved no actual or intended loss

to anyone, and no gain to ROCO.  On the contrary, both the Buyer and the Financial Institution made millions of dollars from the transaction.  To try now to suggest that they were victims of that same transaction distorts the meaning of the word to an absurd degree.  Simply put, the Buyer's decision to involve the Financial Institution in this transaction—which in no way benefitted Mr. Ross and which caused no loss to anyone—should not inflate Mr. Ross's sentencing guidelines range in this way.

Respectfully submitted,

s/Mark J. Kriger                           s/N. C. Deday LaRene
LaRENE & KRIGER, P.L.C.           LaRENE & KRIGER, P.L.C.
645 Griswold Street, Suite 1717    1717 Penobscot Building
Detroit, Michigan  48226             Detroit, Michigan 48226
(313) 967-0100                           (313) 967-0100
E-Mail: mkriger@sbcglobal.net     E-mail: d6644@deday.net
Michigan State Bar No. 30298       Michigan Bar No. P16420


DATE: January 15, 2024

CERTIFICATE OF SERVICE

I hereby certify that on January 15, 2024  I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record and served it by email on United States Probation Officer Xia Vue at xia_vue@miep.uscourts.gov.

s/N. C. Deday LaRene
LaRene & Kriger, P.L.C.
1717 Penobscot Building
Detroit, Michigan 48226
(313) 967-0100
E-mail: d6644@deday.net
Michigan Bar No. P16420