UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,                              CRIMINAL NO. 23-cr-20451

v.                                       HON. JONATHAN J.C. GREY

TYLER N. ROSS,

       Defendant.
_____/

**Government's Reply to the Defendant's Response to the Government's Sentencing Guidelines Brief**

Tyler Ross makes two arguments why he should not be held accountable for his fraudulent conduct in connection with the 2019 Sale: (1) blaming the victim, whether the Buyer or the Financial Institution, for not uncovering his fraud; and (2) claiming ignorance of the Financial Institution's involvement in the 2019 Sale at the outset. (*See* Doc 24). Both arguments lack support in both fact and law.

Victim negligence is not a defense to any of Ross's criminal conduct. *See United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009) ("A perpetrator of fraud is no less guilty of fraud because his victim is also guilty of negligence."); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) ("The victim's negligence in permitting a crime to take place does not excuse the defendant from culpability[.]");

1

*United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995) ("The negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct."). And Ross was certainly not ignorant of the Financial Institution's involvement in the 2019 Sale well in advance of closing, which was the operative moment when the Financial Institution agreed to finance the sale. *See United States v. Nicoletti*, 849 Fed. App'x 574, 580 (6th Cir. 2021).

Ross's arguments related to his conduct for the 2019 Sale are not well grounded for the reasons stated in the government's initial brief and herein. Accordingly, the guidelines calculation for Ross should result in a **total offense level of 23**, which carries a guideline range of 46-57 months' imprisonment (assuming he falls in Criminal History Category I).

## I.     Ross Committed Fraud Against the Buyer

As a starting point, it is worth remembering what a T12 is—a *trailing* twelve-months operating statements for real estate properties.  In other words, it is a historical summary of the expenses and income previously incurred and produced by a particular property over a twelve-month period. T12s are not, contrary to Ross's claim, projected or aspirational statements for marketing. (*See* Doc. 24 at 5). In fact, there is another document used in this industry for projected or aspirational information—a property budget. ROCO and Ross created and used *pro forma* budgets with projected information and in many instances provided those budgets to

lenders at the same time and in the same emails in which they provided T12s for the same properties. Ross clearly understood the difference between a historical T12 and a projected budget and how each were used, notwithstanding his present efforts to conflate the two and rebrand T12s as "marketing materials."[1] (*See id.*).

Ross baldly states that ROCO provided raw data to the Buyer sufficient for the Buyer to "determine the true operating income and expenses." (*Id.* at 6). This claim is misplaced for several reasons. First, blaming the victim is not a defense. Second, the Buyer did not determine the true operating income and expenses. Third, providing some true information does not negate Ross's systematic falsification of the T12s. Fourth, Ross fails to explain how the Buyer was supposed to recreate ROCO's books and records. (*See id.*). For example, for University Courtyard in 2018, Ross did not falsify the insurance and tax expenses (which as Ross noted were provided to the Buyer) but instead falsified things like bad debt, rent concessions, termination fees, miscellaneous income and repairs, and employee benefits, which either would not show up in the documents Ross cited or would be very difficult to track. (*See* Doc. 19, Ex. 2).

---

[1] Ross admitted in his plea agreement that T12s were used by lenders to obtain favorable mortgage valuations in connection with refinancing applications and to potentially restrict future lending opportunities. (*See* Doc. 12 at 5-6). Furthermore, under contractual provisions with at least one GSE lender (which governed University Courtyard, among other properties), the NOI provided by ROCO had a direct affect on the amount of money available to ROCO to draw from that particular credit facility and low NOI could also result in ROCO having to put up additional collateral or other funds to comply with the terms of the agreement. *See generally* Exhibit 10.

Ross also incorrectly claims that the government's position that most of Ross's T12 falsifications were not discovered by the Buyer is "simply not accurate." (Doc. 24 at 7). As Ross later notes, the Buyer did discover $3.5 million of Ross's falsifications and reported that information to the Financial Institution: "[W]e [the Buyer] identified $3.5 [million] of other income that we did not believe was actually being collected and we 'right-sized' operating expenses by ~$375/unit" and as a result negotiated a price reduction "from $700 [million] down to $632.5 [million]." (Doc. 24 at 16, Ex. 9). However, the actual difference between Ross's falsified 2018 NOI in the T12s provided in connection with the 2019 Sale, and ROCO's true internal NOI was approximately $10 million. (Doc. 19, Ex. 4). In other words, the Buyer only discovered $3.5 million out of Ross's $10 million in NOI falsification—most of the falsification was not discovered.

Finally, Ross asserts (again without documentary support) that the Buyer made tens of millions of dollars on subsequent sales of the ROCO properties and that, because the Buyer subsequently engaged with ROCO, he was not defrauded by Ross. (Doc. 24 at 9). These allegations have no bearing on the elements of the crimes at issue or the related sentencing factors. And it is worth noting that the government never shared the comprehensive set of ROCO's true T12 data it acquired during the investigation with the Buyer and only shared some high-level details of that information in May 2023 (well after the 2022 meeting Ross references in his

4

response). (*Id.*). Contrary to Ross's claims, the Buyer indicated that he expected to lose tens of millions of dollars on his resale of the ROCO properties acquired in the 2019 Sale brought on by the loan default and further explained that he had to inject tens of millions of dollars in the properties that Ross does not account for in his response.

To distract from the basic facts of his conduct, Ross blames the Buyer for relying on the T12s and for not uncovering the full extent of Ross's falsification. But these are not defenses to wire fraud. The undisputed facts plainly meet the elements of wire fraud—he executed a plan to falsify T12s and provide them to the Buyer electronically in order to convince the Buyer to pay ROCO money for the properties in the 2019 Sale, intending to deceive the Buyer about the prior financial performance of the properties. *See* Sixth Circuit Criminal Pattern Jury Instruction 10.02 (2019 Ed. Updated March 2021).

## II. Ross Committed Fraud and Made False Statements Against the Financial Institution

Ross argues that he did not commit any crimes against the Financial Institution because he had no motive. (Doc. 24 at 10). However, motive is not an element of any of the crimes at issue. *See* 18 U.S.C. §§ 1014, 1344. Even if motive were at issue, the idea that Ross was better off by keeping the Buyer's penalty fee if the deal fell apart is belied by the fact that ROCO agreed to substantial price reductions, which resulted in a profit of less than the $37 million available through the penalty

provision. By proceeding with the sale, Ross and ROCO were able to offload a number of underperforming properties and avoid putting the tens of millions of dollars into the properties that the Buyer subsequently had to inject. And in order for the sale to go forward at the agreed price, Ross needed the Financial Institution to arrive at favorable valuations based on the T12s, just like Ross did in the refinancing applications referenced in his plea agreement. (*See* Doc. 12 at 5).[2] In short, Ross's motive to conceal the true financial performance of the properties sold in the 2019 Sale was so that ROCO could get rid of those properties and then pocket more than $2 million himself from the sale proceeds.

Ross also argues that he did not know that any financial institution would be involved in the Buyer's purchase of the ROCO properties at the time ROCO provided the T12s to the Buyer. (Doc. 24 at 10). Ross fails to address in his response that he knew at the time of closing that the Financial Institution was financing the 2019 Sale, which is legally sufficient where the signing of the agreement constitutes the execution of the crime. *See Nicoletti*, 849 Fed. App'x at 580 (finding that the

---

[2] Contrary to what Ross indicates in his response, the purpose of the falsifications was more than just to avoid the lockbox: "ROSS and his co-conspirators agreed to, and did, submit, and cause to be submitted, false financial documents to mortgage lending businesses for underperforming ROCO Properties, making the properties appear to be more profitable than they were" to "obtain favorable mortgage valuations in accordance with lenders' underwriting requirements and influence the actions of those lenders in connection with the refinancing applications." (Doc. 12 at 5; *see* Doc. 24 at 3, n.3).

identification of the lender on settlement statements was sufficient to prove the defendant's knowledge of the lender).

However, Ross also admitted in his recorded statement to law enforcement that he understood ROCO's T12s would be submitted to the Financial Institution based on his own experience as a buyer submitting seller-provided T12s to lenders for property purchase financing. And he admitted as part of his plea agreement that he submitted false T12s to the GSEs for ROCO's own refinancings to obtain favorable lender underwriting valuations. (Doc. 12 at 5). In addition, Ross had substantial industry experience and knew that this type and size of deal would require financing, a point he acknowledged in his response: "Ross would have realized a far larger profit had the Buyer not been able to secure financing and for that reason did not close on the deal." (Doc. 24 at 13-14). Finally, Ross's argument here also is not accurate on its face—Ross did submit falsified T12s in connection with the 2019 Sale even after he knew that the Financial Institution was financing the sale. Specifically, according to email correspondence, Ross was aware of the Financial Institution's involvement in the sale at least as of late April 2019 and still on May 15, 2019, Ross caused falsified April 2019 T12s to be emailed to the Buyer as part

of the due diligence process, which the Buyer in turn provided to the Financial Institution. *See* Exhibits 11 and 12.[3]

Ross also cites *United States v. Loughrin*, 573 U.S. 363-64 (2014) for the limiting proposition that the false information must be provided for the sole purpose of providing it to a bank, arguing that because the Buyer was using the T12s for its own purposes they were not being provided only for the purpose of providing them to the Financial Institution. (*See* Doc. 24 at 12). However, read in context, it is clear that the language quoted by Ross is being used as an example of how a counterfeit check could be used in violation of the bank fraud statute, not as a limiting construction on the statute. *See Loughrin,* 573 at 363-64. The Supreme Court elaborated in *Loughrin* that the bank fraud language "demands that the defendant's false statement is the mechanism naturally inducing a bank (or custodian) to part with its money." *Id.* at 365. In Ross's case, it is the falsified T12s that induced the Financial Institution to finance the 2019 Sale. Moreover, the defendant argued in *Loughrin* that his intent to deceive ran only to the third party that passed on the false information to the bank, and the Supreme Court specifically rejected this argument,

---

[3] ROCO previously provided Ross's falsified 2016, 2017, and October 2018 T12s to the Buyer on November 27, 2018, Ross's falsified 2018 T12s on January 25, 2019, and Ross's falsified February 2019 T12s on March 13, 2019. *See* Exhibits 13-15. During this same time period, ROCO and Ross provided separately falsified T12s to the GSEs for some of the very same properties for the fourth quarter of 2018 on February 22, 2019, and for the first quarter of 2019 on May 14, 2019. *See* Exhibits 16 and 17.

8

finding that the defendant did not need to have "a specific intent to deceive a bank." *Id.* at 356-57.

Ross argues that he has not committed any violations of 18 U.S.C. § 1014 because he lacks motive, provided accurate information to the financial institution (including a sampling of bank statements), and did not act jointly with the Buyer. (Doc. 24 at 13-14). For the same reasons stated above, Ross's arguments about motive and blaming the victim (in this case, the Financial Institution) for failing to uncover the full scope of Ross's T12 falsifications are deficient. The government's position is not that Ross acted jointly with the Buyer to submit the false T12s to the Financial Institution, but rather that Ross caused the Buyer to submit false financials to the financial institution which, if Ross had done himself, would have constituted criminal conduct in violation of 18 U.S.C. § 2(b)—whether that conduct was bank fraud or false statements.

In attempting to illustrate his lack of intent, Ross argues that he provided accurate NOI information to a different department of the Financial Institution in an unrelated loan application. Notwithstanding the entirely unrelated nature of this conduct that took place more than a year prior to the 2019 Sale, this argument has an additional problem—the information that was provided was misleading. *See* Exhibit 18. The spreadsheet of additional financial information ROCO provided to the Financial Institution did not actually contain comprehensive historical T12

9

information.[4] For a substantial number of the properties for which only budget or T3 information was provided, ROCO possessed comprehensive T12 information (information that was subsequently obtained by the government in this investigation) that it chose not to provide to the Financial Institution.

Two examples from this spreadsheet relate to properties identified in the Information and Plea Agreement: University Courtyard and Barrington Park. For University Courtyard, ROCO's internal T12 information from October 2016-September 2017 (the spreadsheet is dated October 2017) reflected an NOI of approximately negative $86,000, while the "budget" NOI sent to the Financial Institution in the spreadsheet was substantially higher: approximately $219,000. And for Barrington Park, ROCO's internal T12 information from October 2016-September 2017 reflected an NOI of approximately $97,000, while the "budget" NOI sent to the Financial Institution in the spreadsheet was also substantially higher: approximately $279,000. By choosing to include budget projections rather than the available T12 information that ROCO possessed, ROCO presented a misleading picture of the NOI and associated property values, as illustrated by these two properties.

---

[4] Of the 95 ROCO properties listed on the spreadsheet, 23 calculated the NOI based on "budget" projections rather than actual historical information. 47 calculated the NOI based on T3 information, and 25 calculated the NOI based on T12 information that appears to not have been manipulated (only 11 of which were included in the 2019 Sale). *See* Exhibit 18.

To summarize, even when not blaming the Financial Institution or claiming he had no motive to make his company's properties appear more profitable, the NOI information that Ross describes as accurate was provided to the Financial Institution through an entirely separate process and at a different time than the 2019 Sale, did not include comprehensive T12 information, and, at least in some instances, was misleadingly presented.

### III. Ross Obtained More than $1 million from the Financial Institution as a Result of His Offenses

There appears to be no dispute that Ross received over $2 million in proceeds from the 2019 Sale. The disagreement instead centers on whether the offenses against the Buyer and Financial Institution are sufficiently closely related to Ross's receipt of those funds. (*See* Doc. 24 at 15-20). As a starting point, it is important to remember that the Financial Institution did rely on Ross's falsified T12s to assess the properties' cash flow, to value the properties, and to appraise the properties, all to evaluate the terms of the loan to offer to the Buyer to finance the 2019 Sale. (*See* Doc. 19 at 23-26). The Financial Institution further relied on Ross's falsified T12s to prepare historical operating information about the properties for investors who subsequently purchased the Financial Institution's securities of the debt from the Buyer's loan. (*Id.* at 25).

Ross argues that the Financial Institution could not have relied on Ross's falsified T12s because it knew them to be inaccurate, notwithstanding the documents

11

and other information indicating the Financial Institution did rely on the false T12s and did not know the properties' true NOIs. (*See* Doc. 24 at 15-17). Here, Ross again attempts to shift the blame for his conduct and falsifications to the Financial Institution for not uncovering his fraud and suggesting that certain Financial Institution employees may have had suspicions about the T12s. That suggestion (even if it were true) is also unavailing as a defense under Sixth Circuit law because it is the institution, not the employees, who is the victim. *See United States v. Winkle*, 477 F.3d 407, 414 (6th Cir. 2007) ("the victim of a bank fraud is the bank, not the CEO of the bank, and approval of a bank officer does not relieve a defendant of liability for bank fraud"); *United States v. Abboud*, 438 F.3d 554, 593 (6th Cir. 2006) ("Finally, even if bank officials did approve of the check kiting scheme, which they did not, this approval would not relieve Defendants of criminal liability, because the victim is the bank as an entity.").[5]

Ross also argues that the Financial Institution could not have issued its loan because of the falsified T12s, but ignores the fact that the valuation, interest rate, and other terms of the loan that was offered by the Financial Institution for the 2019 Sale would not have otherwise been available. *See id.* at 18. In other words, the terms of

---

[5] Courts have also reached the same conclusion for violations of § 1014. *See United States v. Kellett*, 62 F.3d 1411 (1st Cir. 1995) (collecting cases and finding that "[t]he case law is clear that the complicity of a bank or of bank officers is not a defense in a section 1014 prosecution.") (citations omitted).

the final agreed-upon loan would not have been approved by the Financial Institution and available to the Buyer had the Financial Institution known the true NOIs. And under those circumstances, it is not at all clear that a deal could have been reached. Therefore, the actual loan the Financial Institution issued was issued because of Ross's falsified T12s.

Ross additionally claims that the Financial Institution must be both the "target" and "victim" of the offense for purposes $1 million enhancement because he did not target the Financial Institution, citing *United States v. Muho*, 978 F.3d 1212, 1224-26 (11th Cir. 2020). *Id.* at 18. However, *Muho* makes clear that the applicable analysis relating to whether the Financial Institution is the victim and the target is one of "source and victimization." 978 at 1225. In this case, the Financial Institution is clearly the source of the funds because it funded the loan that financed the 2019 Sale and was also the victim because it was the Financial Institution's funds that were loaned out, not Ross's, which was the distinction the *Muho* court drew in that case. *See id.* at 1224-25.

Ross also quotes language from *United States v. Huggins,* 844 F.3d 118 123-24 (2d. Cir. 2016) that the primary purpose of the $1 million enhancement is to "penalize an individual for placing a financial institution at risk by borrowing or stealing funds to support criminal activity" to suggest that since Ross did not directly submit the T12s to the Financial Institution himself he should not be held responsible

13

under this enhancement. (Doc. 24 at 19). In another passage Ross cites, the court explained that the rationale for the enhancement is about potential impact on the financial system: "it could trigger an FDIC audit or payout, it could endanger the deposits or investments of many innocent people," it could "prompt layoffs or stock selloffs," or it could "shake public or community confidence in the financial system, and deter individuals from depositing or investing their money." *Muho*, 978 F.3d at 1225 n. 8. Where Ross knew that his false T12s would be submitted to the Financial Institution for a $480 million loan and even admitted in his plea agreement that lenders rely on T12s for their underwriting valuations when they issue loans, it is proper to hold him accountable for placing the financial system at risk. This is even more true where, as here, the debt was also securitized and sold to investors in the market—the investors bore the risk while Ross got to keep his $2 million.

Ross's final argument sets aside the legal applicability of the enhancement to the facts of his case to assert that the application of the $1 million enhancement in this case through the Financial Institution's involvement would be "draconian." (*See* Doc. 24 at 19-20). Congress does not agree with Ross. Unlike much of the Guidelines which has been enacted through the U.S. Sentencing Commission's promulgation process, the $1 million enhancement at issue here was passed into law

by Congress in the Crime Control Act of 1990. Pub. L. No. 101-647, § 2507, 104 Stat. 4789, 4862.[6]

In pleading guilty, Ross admitted that, for at least four years, he worked with others and systematically falsified T12 information that was provided to mortgage lending businesses. He does not dispute that he also falsified T12s that were provided to the Buyer and the Financial Institution as part of the sale of $518 million in ROCO properties or that the sale resulted in him pocketing over $2 million. Far from being "draconian," in setting the base offense level to 24, Congress intentionally passed a law designed to address a case precisely like this one—where a defendant receives the benefit of substantial financial proceeds from their criminal conduct but their guideline range is otherwise too low to accurately reflect the severity of that conduct.

---

[6] In relevant part, the Crime Control Act of 1990 states:

"INCREASED PENALTIES IN MAJOR BANK CRIME CASES. (a) INCREASED PENALTIES.—Pursuant to section 994 of title 28, United States Code, and section 21 of the Sentencing Act of 1987, the United States Sentencing Commission shall promulgate guidelines, or amend existing guidelines, to provide that a defendant convicted of violating, or conspiring to violate, section 215, 656, 657,1005,1006, 1007, 1014, 1032, or 1344 of title 18, United States Code, or section 1341 or 1343 affecting a financial institution (as defined in section 20 of title 18, United States Code), shall be assigned not less than offense level 24 under chapter 2 of the sentencing guidelines if the defendant derives more than $1,000,000 in gross receipts from the offense."

Pub. L. No. 101-647, § 2507, 104 Stat. 4789, 4862.


## IV. Conclusion

For the reasons described in the Government's Sentencing Guidelines Brief and herein, the Court should find that Ross's conduct in connection with the 2019 Sale constitutes relevant conduct in this case and that the $1 million enhancement pursuant to § 2B1.1(b)(17)(D) applies.

    Respectfully submitted,
DAWN N. ISON
United States Attorney

s/Andrew J. Yahkind
ANDREW J. YAHKIND
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226

Glenn Leon, Chief
Fraud Section, Criminal Division

s/Andrew R. Tyler
ANDREW R. TYLER
PHILIP B. TROUT
Trial Attorneys
1400 New York Ave., NW
Washington, D.C. 20005

Dated: January 22, 2024

## Certificate of Service

I hereby certify that on January 22, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Mark Kriger and Deday LaRen
Attorneys for Tyler Ross

I also certify that I will, on today's date, email a copy of the foregoing document to Xia Vue, the assigned probation officer in this matter.

<p style="text-align:right">s/Andrew R. Tyler<br>
Andrew R. Tyler<br>
Trial Attorney<br>
U.S. Department of Justice<br>
Criminal Division, Fraud Section</p>