UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.                                                                  Case No. 23-20451
                                                                 Hon. Jonathan J. C. Grey

TYLER ROSS,

        Defendant.
_____/

**POST-HEARING BRIEF**

As the language of the disputed enhancement, U.S.S.G. § 2B1.1(17)(A) specifically requires, to be applicable, it must be shown that "the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions *as a result of the offense*." (Emphasis supplied). As noted in defendant's prehearing submission, the cases - and ordinary principles of causation - require that, to meet this standard, the government prove "actual reliance" on the inaccurate T12's. *See,* R.E. 24, Brief, Page ID # 492-495. and authorities there cited.

To the extent that the government attempted at the evidentiary hearing to establish that either the purchaser or the lender in fact relied on the supposed accuracy of the T12s supplied to the buyer by ROCO, that effort clearly foundered on the lack of credibility of the witnesses called to support it.

As to the witness Borko Milosev, his assertion of reliance on the accuracy of the T12s was directly contradicted by his prior inconsistent statements which, although he attempted to avoid them, he ultimately acknowledged. Thus, he testified that he knew the critical element of NOI was incorrect, and that the state of the data was of "concern:"

> Q. Okay. So it is true, is it not, sir, that on October 30, 2020, you told the government that ROCO's portfolio NOI was much lower than they thought and it was the concern -- there was concern about the state of the financials of ROCO's portfolio; correct?
>
> A. Correct.

R.E. 32, Transcript, Page ID # 944.

And he acknowledged that, early on in the process, he called these inaccuracies to the purchaser's attention, enabling him to negotiate a significant reduction in price:

> [Q.] It is correct, sir, is it not, that on October 30, 2020, you told the government that in February of 2019 you thought the value of ROCO's portfolio was less than what was purported for an NOI of $745,000,000; correct?
>
> A. Yes.
>
> Q. And, in fact, you -- that's what you told Mr. Chetrit; correct?
>
> A. Correct.
>
> Q. And as a result of what you told him, he called a meeting with Mr. Ross and told him what you found, what you had found; correct?

> A. Correct.
>
> Q. And he renegotiated the deal --
>
> A. Yes.
>
> Q. -- at that meeting, lowered the price or the anticipated purchase price quite a bit; correct?
>
> A. Correct.

R.E. 32, Transcript, Page ID # 945.

In this regard, he specifically - if reluctantly - acknowledged admitting that he told the investigators that he "knew the ROCO NOI figures were wrong and therefore couldn't rely on them:"

> Q. So it is true, is it not, that in December of 2020 you told the government that you knew the ROCO NOI figures were wrong and therefore couldn't rely on them; right?
>
> A. We caught some mistakes, yes.

R.E. 32, Transcript, Page ID # 948. (Although he - incredibly, in the view of the writers - denied making the statement attributed to him in the investigative material were "not right" that he in fact did not rely on them. *Id.,* at Page ID # 949) despite having testified that he had been truthful in his previous statements to the investigators. *Id.,* at Page ID # 943.)

As to the witness Joseph Geoghan, his testimony was undercut not merely by conventional indicators of credibility (or the lack thereof), but also by the four corners of the documentary evidence, which he struggled manfully (if, in the view of the writers, ineffectually), to evade.

Thus, for example, after apparently having denied to the investigators the very day before that he had ever seen the email string admitted as Exhibit Q,[1] he ultimately acknowledged that, early on in the process, he was made aware of the discovery of misstatement of income and operating expenses in the T12s that he conceded were "significant:"

> Q. On page 2 of the exhibit Patrick Perone is explaining to Elizabeth King, with a copy to you, about the circumstances under which this price reduction was negotiated.
>
> And specifically it says that -- under "Price Reduction: Subsequently, during our diligence period we identified $3.5 million of other income that we did not believe was actually being collected and we right-sized operating expenses by $375 per unit. As a result we were able to negotiate a price reduction from 700,000,000 down to 632,500,000."
>
> A. Yes.
>
> Q. A 67 -- $67.5 million price reduction is about -- well, what, about 10 percent or almost 10 percent of the original agreed price; correct?

---

[1] Although at the hearing he claimed to remember the email string, R. E. 32, Transcript, Page ID # 979, he refused to acknowledge a contrary statement attributed to him in the course of his preparation for testimony the day before - that he did "not recall the email." *Id.,* at Page ID # 984.

> A. Yes.
>
> Q. This kind of defect or misstatements that they identified, these were not rounding errors; right?
>
> These were significant gaps between what was presented in the T12s and the reality of what was happening; correct?
>
> A. I -- I would prefer you don't use the word --
>
> Q. Do you agree or not agree that 10 percent is a significant difference, especially when you're talking about this kind of money?
>
> A. I think 10 percent is significant.

R.E. 32, Transcript, Page ID # 980.

The writers would submit that any claim of reliance on documents so "significantly" flawed seems, frankly, dubious at best.

Mr. Geoghan's testimony regarding defense Exhibit R, a text message string between his fellow employees Michelle Yousefian and Elizabeth King, and, specifically, his efforts to escape its obvious impact, is even more telling.

It will be recalled that Exhibit R is three pages long, and includes text messages over a period of time, and on various subjects. Mr. Geoghan was specifically asked about a series of interchanges on the last page of the Exhibit, containing messages sent between 4:52 PM and 6:20 PM, beginning about an hour after the previous message (sent at 3:54 PM) and almost 18 hours before the next (sent at 11:25 AM), which read as follows:

5

>Yousefian, Michelle 4:52 PM:
>I can come by to discuss roco?
>
>King, Elizabeth A 4:52 PM:
>yes
>
>King, Elizabeth A 6:10 PM:
>seriously
>
>Yousefian, Michelle 6:10 PM:
>ridic
>
>King, Elizabeth A 6:15 PM:
>there isn't going to be a deal to close
>I seriously give up
>
>Yousefian, Michelle 6:19 PM:
>I don't get why the expenses are a secret
>
>King, Elizabeth A 6:20 PM:
>be they are made up

R.E. 32, Transcript, Page ID # 986-987

The obvious context of this interchange is that, in the first two messages (at 4:52), Ms. Yousefian and Ms. King agree to meet to discuss ROCO, and in the messages that follow (at 6:10 - 6:20) they are commenting on what transpired - and specifically, that the "expenses . . . are made up." What expenses, one may ask? Obviously, the expenses they had just been discussing - ROCO's.

Mr. Geoghan, however, in attempting to avoid the obvious - that he and his co-employees had in fact known that the T12s were inaccurate, and therefore

6

unworthy of reliance, insisted, contrary to the obvious context, that the remarks did not concern the ROCO transaction, but rather a property in Florida known as Margaritaville - notwithstanding the fact that the problems at that property did not involve "made up" expenses:

> Q. Okay. So the expenses in the Margarita deal, they were made up?
>
> A. No, they weren't made up, but the –

R.E. 32, Transcript, Page ID # 987-988.

Also, tellingly, when on redirect, he was offered a lifeline based on the inaccurate supposition that the email chain in Exhibit Q came *after* the text messages in Exhibit R, he jumped at it unhesitatingly:

> Q. Okay. And does the date comparison between the February 20 email versus the April 18, 2019, chat, does that give you any information about your view on this?
>
> A. I'll draw the obvious conclusion, which is, we didn't get the information about the price reduction and why there was a price reduction until several days after Michelle said, "Hey, we have an expense problem," which I think also confirms in my mind that she was talking about another transaction, not the ROCO transaction.
>
> Q. Sorry. The chat was April 18 and the $3.5 million email was two months earlier.
>
> A. Okay.
>
> Q. Is that right?
>
> A. Okay. Sorry. I misunderstood.

R.E. 32, Transcript, Page ID # 995-996.

The government witnesses' testimony was not sufficient to defeat the obvious conclusion that representatives of both the buyer and lender were aware of the kind of inaccuracies in the T12s that would have foreclosed reliance on them in making purchasing or lending decisions.[2] At the same time, the fact that the agents and employees were not shown to be the kind of "faithless servants" involved in cases such as *United States v. Winkle,* 477F.3d 407 (6th Cir. 2007) and *United States v. Abboud,* 438 F.3d 554 (6th Cir. 2006), which the government cited in its reply to defendant's response to its prehearing memorandum removes this case from the reach of those decisions, to the extent that they may have been applicable in the first place.. *See,* R. E,. 27, Reply, Page ID # 674-675.

Indeed, despite the language of those decisions, in fact it is people, not institutions, that make decisions, and here, responsible people at both buyer and lender made decisions with knowledge that the T12s were inaccurate, and not to be relied upon. That they chose to do so - or even to incorporate figures from the documents known to be inaccurate in their own presentations to third parties, for

---

[2] Indeed, any claim that the T12s were a necessary precondition to making a loan is given the lie by Government Exhibit 18, which reveals that the Financial Institution made a separate loan to ROCO on a group of properties for which ROCO did not furnish any such documents., *See,* R.E. 32, Transcript, Page ID # 886-887.

their own reasons, does not change the fact that the decisionmakers involved well knew that the T12s were not accurate, and not worthy of reliance.

Moreover, Mr. Geoghan's testimony is wholly inconsistent with JP Morgan's interactions with ROCO not only in the years after the Chetrit transaction. . At the evidentiary hearing, Mr. Geoghan testified that JP Morgan would never do business with somebody who provided misleading or misstating information. ECF No. 32, PageID.973. Yet less than a week after the hearing, JP Morgan reached out to Mr. Ross in an effort to do business with ROCO. See Exhibit A, attached hereto.

This behavior echoes that of the buyer, who, it will be recalled also reached out to purchase additional properties from ROCO and do more business with ROCO even after he learned of the investigation.

Underscoring all this, of course, is the fact that, as Mr. Ross's statement to the investigators demonstrated, ROCO actually provided both the buyer and lender the full range of accurate information about the properties, as S/A Lane acknowledged:

> [Q.] And Mr. Ross told the agent: "We sent JPMorgan bank statements, yeah. So the case of, like, Chetrit, you know, they had asked for -- well, and JPMorgan was their lender, they wanted bank statements, so we sent them bank statements. So they had the actual numbers."

>       Do you recall that?
>
> A. Bank account numbers, yes. I recall that, yeah.
>
> Q. So they had the actual numbers that were in the bank statements?
>
> A. Correct.
>
> Q. Okay. And the agent said: "So you sent JPMorgan bank statements?" And Mr. Ross answered: "We sent JPMorgan bank statements."
>
> A. Yes.

R.E. 32, Transcript, Page ID # 905.[3]

>                                Respectfully submitted,
>
>                                s/Mark J. Kriger
>                                s/ N. C. Deday LaRene
>                                LARENE & KRIGER, P.L.C.
>                                645 Griswold Street, Suite 1717
>                                Detroit, Michigan  48226
>                                (313) 967-0100

DATED: February 28, 2024

---

[3] This factual scenario is echoed in the stipulation of the parties announced at the beginning of the hearing, R.E. 32, Transcript, Page ID # 845, as follows:

> "The parties stipulate that at the time ROCO supplied the false T12s to the Chetrit Group," C-h-e-t-r-i-t, "ROCO also supplied the Chetrit Group certain data taken directly from ROCO's software program, Yardi," Y-a-r-d-i, "which accurately reported certain expenses and revenue of the properties that were purchased by the Chetrit Group.

CERTIFICATE OF SERVICE

I hereby certify that on February 28, 2024 I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notification of such filing to all counsel of record and served it by email on United States Probation Officer Xia Vue at xia_vue@miep.uscourts.gov.

                                        s/N. C. Deday LaRene
                                        LARENE & KRIGER, P.L.C.
                                        1717 Penobscot Building
                                        Detroit, Michigan 48226
                                        (313) 967-0100
                                        E-mail: d6644@deday.net
                                        Michigan Bar No. P16420