UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,                      CRIMINAL NO. 23-cr-20451

v.                                   HON. JONATHAN J.C. GREY

TYLER N. ROSS,

              Defendant.

_____/

**<u>Government's Response to the Defendant's Post Hearing Brief</u>**

The testimony and records presented by the government at the February 13, 2024 evidentiary hearing further substantiated the draft PSR's conclusion that the 2019 Sale of ROCO property for over $500 million utilizing falsified T12s was (1) relevant criminal conduct to Tyler Ross's count of conviction for conspiring to falsify T12s and (2) Ross personally received more than $1 million as a result of that conduct, rendering U.S.S.G. § 2B1.1(b)(17)(D) applicable.

In sum, the evidence presented at the hearing made clear: (1) both the Buyer and the Financial Institution relied on the falsified T12s to analyze the purchase price and offer financing terms, respectively; (2) notwithstanding substantial due diligence efforts by both the Buyer and the Financial Institution, they did not uncover most of

1

Ross's T12 falsifications; (3) at the end of the due diligence period the Buyer and Financial Institution incorrectly believed they had uncovered all the inaccuracies in ROCO's T12s and that these inaccuracies were not the result of intentional misstatements; (4) the Buyer's valuation of the 2019 Sale properties and the Financial Institution's loan terms (if any) would have been substantially different had they known the true T12 information which would likely have killed the sale; and (5) Ross personally received $2.1 million in funds directly traceable to the Financial Institution's loan proceeds from the 2019 Sale. (*See generally,* ECF No. 32.)

Ross, who has admitted to dishonestly creating false financial statements for years, attempts to distract attention from his own conduct by brazenly claiming that Mr. Milosev and Mr. Geoghan cannot be trusted in their detailed explanation of why his lies—which required painstaking effort—mattered. (ECF No. 33 at 1.)[1] In doing so, Ross entirely ignores the uncontroverted contemporaneous documentary evidence supporting the testimony that both the Buyer and the Financial Institution did rely on the Falsified T12s. (*See* Exs. 7, 9, 19, and 20.) During the hearing, Mr. Milosev walked through in detail exactly how Ross's falsified T12s were

---

[1]     In a footnote, Ross also raises an unrelated 2017 Financial Institution loan for the bald and unsupported assertion that T12s were not required to make a loan without any record or evidence on this point (including facts that may well differentiate that type of loan from those at issue in this proceeding). (*See* ECF No. 33 at 8, n. 2.) All that is known is that it was not a loan financing for a multi-family property because that division is run by Mr. Geoghan and there is no evidence that his division even knew about that loan.

incorporated as baseline financial data for analyses, projections, and property valuations in two spreadsheets he worked on as part of the Buyer's due diligence (that in turn were used as part of the price negotiation between the Ross and the Buyer). (ECF No. 32, PageID.922, 925-926, 930-936.) Mr. Geoghan, in addition to describing how T12 NOIs were used to evaluate, price, and size the proposed loan, testified that Ross's falsified T12s were directly incorporated into third party appraisal valuations that the Financial Institution relied on to evaluate the properties and proposed loan terms and, further, incorporated Ross's falsified T12s in financial data shared in a term sheet for prospective investors in connection with the sale of securities of the debt from the 2019 Sale. (ECF No. 32, PageID.961-970.) When asked what the Financial Institution would have done if it had learned that one of the parties to the transactions had intentionally falsified NOI information—as Ross and his co-conspirators did—Mr. Geoghan was clear and unequivocal: "We would have killed the transaction." (ECF No. 32, PageID.973.) This testimony and documentary evidence established that both the Buyer and the Financial Institution did rely on Ross's T12s for the 2019 Sale and is sufficient standing alone to support the PSR's conclusions and the government's position.

Ross's claims against Mr. Milosev and Mr. Geoghan do not undermine their credibility. In the first instance, Ross attempts to conflate the idea the Mr. Milosev had uncovered $3.5 million worth of NOI corrections with the idea that Mr. Milosev

knew that the remaining financial information was unreliable. But Mr. Milosev

consistently emphasized he thought the remaining financial information was

accurate and that he relied on the purported accuracy of that remaining information:

> Q. At that point in time did you think you had figured out all of the misstatements on ROCO's T12s?
>
> A. We thought that was it, yeah.
>
> Q. If you had known that there had been substantial NOI that was being overstated that you had not figured out, would that have mattered?
>
> A. It would have.

(ECF No. 32, PageID.929.)

> Q. Mr. Milosev, did you think you had caught all of ROCO's overstated NOI?
>
> A. I thought we had.

(ECF No. 32, PageID.952.)

Mr. Milosev also made clear that he did not believe the issues he had

uncovered were the result of intentional misstatements:

> Q. Did you think ROCO was intentionally making up numbers?
>
> A. No.
>
> Q. You just thought they were in over their head?
>
> A. Correct.

(*Id.*)

The two analysis spreadsheets corroborated this testimony—they show that Mr. Milosev did in fact rely on the T12 information (after the $3.5 million correction) to evaluate the sale for the Buyer. (*See* Exs. 19 and 20). With respect to Mr. Geoghan, Ross attempts to make the same point—that the fact there was a $3.5 million correction made shows that the Financial Institution did not rely on the false T12s.[2] (*See* ECF No. 33 at 4-5.) And again, setting aside Mr. Geoghan's unrefuted testimony that the Financial Institution used the falsified T12 NOI information to evaluate, size, and price the loan, the appraisal and term sheet documents definitively showed that the falsified T12s were relied on by the Financial Institution (and were further passed on to the investing public). (*See* Exs. 7 and 9). Ross also tangentially contests Mr. Geoghan's credibility as to his interpretation of a chat he was not a participant in and an instance where he misunderstood the question and confused two dates, which he acknowledged at the time of his testimony on these points. (*See* ECF No. 33 at 5-7.) By emphasizing these weak blame-the-victim attacks, Ross only serves to highlight the weakness of his argument that he systematically falsified meaningless T12s.

---

[2]     Ross also attempts to make something of the fact that Mr. Geoghan did not recall the email to him relating to the $3.5 million NOI change from approximately five years before when it was first addressed with him during a preparation session the day prior to the hearing but then was refreshed when reviewing the email during the hearing. (*See* ECF No. 33 at 4, n. 1.) This testimony reflects nothing more than a typical witness exchange relating to a years-old document about which the witness needed to have his memory refreshed.

Notwithstanding the clear case law that for purposes of bank fraud, it is the bank that is the victim (which Ross reluctantly acknowledges), Ross further contends (without citing to any authority) that because people make decisions, the plain language of Sixth Circuit authority is inapplicable to this case. (*See* ECF No. 33 at 8-9; *see also United States v. Winkle*, 477 F.3d 407, 414 (6th Cir. 2007).)[3] And finally, Ross triples down on his blame-the-victim strategy by mischaracterizing testimony for the proposition that ROCO provided a "full range of accurate information about the properties" when all the testimony reflected was that bank account statements were provided by ROCO.  But Ross does not come close to showing that bank accounts statements would have been enough to recreate ROCO's true T12s and uncover the full extent of Ross's T12 falsification.[4] Furthermore, even if Ross's victims could have somehow discovered the full extent to which he was defrauding them, that simply is legally irrelevant. It is black-letter law that the potential ability of a victim to figure out they were being defrauded it is not a defense. *See, e.g.*, *United States v. Svete*, 556 F.3d 1157, 1165 (11th Cir. 2009).

---

[3]    To make this contorted argument, Ross is forced to take the absurd position that in the event Financial Institution employees knew of Ross's extensive, comprehensive manipulation of the T12s (which they did not) and still went forward with the loan anyway (thereby putting the Financial Institution at financial and reputational risk), they would not be "faithless servants" to the Financial Institution. (*See* ECF No. 33 at 8.)

[4]    Similarly, the stipulation cited by Ross only allows that "certain data" taken directly from ROCO's internal accounting system was provided to the Buyer, not "the full range of accurate information about the properties. (*See* ECF No. 33 at 10.)

Turning from all the other actors and arguments Ross seeks to use to distract from his own conduct, it is worth revisiting the conduct at issue here. Ross is a well-educated, well-resourced, experienced real estate executive with years of experience running ROCO. He is the largest owner of ROCO and was substantially responsible for its operations during the relevant time period. And he spent countless hours meticulously falsifying hundreds and hundreds of lines of 2016-2019 T12 spreadsheets for the 43 properties sold as part of the 2019 Sale in ways difficult to detect (in addition to all of the hours spent falsifying the T12s for the GSE reporting and refinancing loans that forms the basis of his conviction). He did not spend all that time and effort because the T12s did not matter and he did not think the Buyer and the Financial Institution would rely on those falsified T12s. Ross did it because he absolutely knew they mattered and that the Buyer and Financial Institution would rely on the T12s he falsified (just like the GSEs). And they did.

Respectfully submitted,
DAWN N. ISON
United States Attorney

s/Andrew J. Yahkind
ANDREW J. YAHKIND
Assistant United States Attorney
211 W. Fort Street, Suite 2001
Detroit, MI  48226

Glenn Leon, Chief
Fraud Section, Criminal Division

s/Andrew R. Tyler
ANDREW R. TYLER
PHILIP B. TROUT
Trial Attorneys
1400 New York Ave., NW
Washington, D.C. 20005

Dated: March 6, 2024

**Certificate of Service**

I hereby certify that on March 6, 2024, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the following:

Mark Kriger and Deday LaRen
Attorneys for Tyler Ross

I also certify that I will, on today's date, email a copy of the foregoing document to Xia Vue, the assigned probation officer in this matter.

<u>s/Andrew R. Tyler</u>
Andrew R. Tyler
Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud
Section